AUSTIN W. WRIGHT *et al.*

*v.*

JOHN CUDAHY.

*Opinion filed November 1, 1897.*

1. EVIDENCE—*one asserting secret partnership has the burden of proof.* Where, to all outward appearances and in their relations with third persons, there has been a dissolution of partnership and a transfer of the firm property to one partner, one asserting the continuance of a secret partnership has the burden of proof.

2. SAME—*evidence held insufficient to sustain bill for dissolution of partnership.* A bill alleging the existence of a partnership, and praying for a dissolution and an accounting, is held in this case, after a full consideration of the evidence, to have been properly dismissed by the trial court for want of equity.

3. CONTRACTS—*contract to "corner" the market is void, as a gambling contract.* A contract between parties to purchase together, for future delivery, more of a certain commodity than it will be possible, owing to the shortness of the supply, for the sellers to deliver before their contracts of purchase mature, is a gambling contract, under section 130 of the Criminal Code, and is void.

4. COURTS—*court may inquire into legality of contract, regardless of the pleadings.* A court of equity may inquire into the real nature of the contract it is called upon to enforce, and may admit evidence of the parties to show that it is contrary to law, although no claim of its illegality is made by the pleadings.

*Wright* v. *Cudahy,* 64 Ill. App. 453, affirmed.

APPEAL from the Appellate Court for the First District;—heard in that court on appeal from the Circuit Court of Cook county; the Hon. M. F. TULEY, Judge, presiding.

DARROW, THOMAS & THOMPSON, and S. S. GREGORY, for appellants.

WILLIAM J. HYNES, and H. T. GILBERT, for appellee.

Mr. JUSTICE CARTER delivered the opinion of the court:

Wright, and Catlin, his assignee in insolvency, appellants herein, filed their bill in equity in the circuit court of Cook county to dissolve an alleged partnership be-

tween Wright and John Cudahy, the appellee, and for an accounting. The bill as originally filed embraced, among other defendants, one Hutchinson as trustee, to whom Cudahy had conveyed portions of his property to secure certain of his creditors. Their demurrer was sustained to the bill so far as it charged them or sought to reach property in their hands, leaving the bill pending as against Cudahy. The judgment dismissing the bill as to said Hutchinson and others was affirmed by this court in *Wright*·v. *Hutchinson*, 156 Ill. 575. Appellee, Cudahy, then answered the bill, admitting, in substance, that he and Wright entered into a partnership arrangement on or about the 10th day of April, 1893, for the purchase and sale, on their joint account, of mess pork on the board of trade in Chicago, each to buy or sell in his own name in such quantities as he deemed best, but that they were to share equally the profits and losses. The bill and answer substantially agree as to the arrangement as it was first made. Wright had already bought 37,000 barrels of pork, and Cudahy between 1500 and 2000 barrels, which it was agreed should go into the joint account. It is not disputed that this partnership arrangement continued to May 31, 1893, when, as alleged by Cudahy, it was terminated by agreement and all of the purchases were transferred to Wright's name, and that Wright promised to assume, and did assume, all liability which they had incurred, and that Cudahy was released by Wright therefrom, Wright undertaking to carry on the deal on his own account, Cudahy assuring him that he would assist him all that he could but would be no longer interested in it. It seems that Cudahy was engaged in business with his brothers, who objected to his pork deal with Wright on the ground that it would injure their business, and wanted him to withdraw from it. Wright admits that he had the conversation with Cudahy on the 31st of May, as stated by Cudahy, but says that the withdrawal of Cudahy was to be apparent only,—a mere pre-

tense to satisfy his brothers and to relieve him from all apparent connection with the deal,—but that Wright should proceed in his own name, and as between themselves they would continue to be jointly interested in the enterprise, and that Cudahy was to furnish money when needed to carry it on. It is not disputed that all purchases made before May 31, and which amounted to about 117,000 barrels of pork, were after that date, so far as any of them stood in the name of Cudahy, transferred to Wright by his and the sellers' consent, nor is it shown that Cudahy bought any pork in prosecution of the deal after that date, but it does appear that Wright bought in Cudahy's name 500 barrels of pork, which act Cudahy characterized as "cheeky" but took no action to repudiate. It appears also that Cudahy in several instances took an active interest in certain of the purchases which he had made prior to May 31 and which had been transferred to Wright, which circumstance Wright insists sustains his contention that Cudahy continued to be jointly interested and liable with him, but which Cudahy contends merely shows that he kept his promise to assist Wright in every way he could, and not that he had any further pecuniary interest in the deal.

Both parties agree, and the evidence shows, that to all outward appearances, and in their relations to third persons, there was on the 31st of May a dissolution of the partnership and a transfer of the property purchased to Wright, and we are of the opinion that such apparent termination of the partnership relations of the parties should be treated as an actual dissolution as between themselves, unless it is made to appear by a preponderance of the evidence that, as alleged by Wright, he and Cudahy continued to be partners secretly throughout the deal. In other words, the burden of proof was upon Wright to prove that the termination of their business relations, which they both asserted to others and to the public, was not real but only apparent, and if he failed

to make such proof his bill is not sustained.    Cudahy was at the same time engaged in a larger deal in lard, and in August, 1893, owing to the financial depression and a falling market, he failed, losing in the lard deal more than a million of dollars, and Wright, being unable to pay the margins called for in the pork deal, failed also, his liabilities in the enterprise being upwards of a half million.    Wright made an assignment to appellant Catlin for the benefit of his creditors, and has paid upwards of $225,000 of these liabilities, exhausting his own estate, and now by this bill seeks to compel Cudahy, as a partner with him, to account, and pay also his proportion of the alleged joint indebtedness.

We have carefully examined and considered the evidence, which is voluminous, but are unable to find that there is any preponderance in favor of the complainants in the bill.    Each of the parties testified in support of his own contention, and each was supported, to some extent, by other testimony and by certain circumstances, but, taking it altogether, we are inclined to the view that the evidence tends fully as strongly, if not more so, to support the contention of Cudahy as that of Wright. Wright's counsel say that it is wholly unreasonable to believe that Wright would have agreed, after they had purchased 117,000 barrels of pork for which they were jointly liable, to assume the whole liability himself, and that he would have carried on such a colossal deal upon his own capital and responsibility, when he might, by holding Cudahy to his contract, have had the assistance of one whose capital and credit were then supposed to be practically unlimited.    The evidence shows, however, that Wright had capital of his own, upon which he could draw to the extent of more than $400,000, and that at the time of the alleged dissolution the market was rising and the prospect of considerable gains was good.    Besides, he was assured by Cudahy that the latter would assist him, and it is not an unreasonable view that Wright was

influenced by the prospect of acquiring for himself the whole of the profits instead of dividing them with Cudahy. At any rate, Wright has failed to establish, by a preponderance of the evidence, that there was, by agreement between himself and Cudahy, a secret partnership after the understanding between them of the 31st of May, and the transfer of the purchases theretofore made, to him. So finding, we consider it unnecessary to extend the length of this opinion in reviewing the evidence in detail.

It is also insisted on the part of appellee that if the evidence showed that the partnership did in fact continue until the failure, still the contract was a gambling contract under the statute, against public policy, and void. This defense was not set up in the answer but does appear in the proof. Appellants insist, however, that the evidence upon this point was erroneously admitted over their specific objection and cannot be considered, on the ground that the allegations and proofs must correspond, and that proof without allegations in the pleadings is of no more avail than would be allegations without proof. It is also contended by appellants that the evidence does not bring the contract within the terms of the statute. We think it does. Section 130 of the Criminal Code of this State provides: "Whoever * * * forestalls the market by spreading false rumors to influence the price of commodities therein, or corners the market, or attempts to do so, in relation to any of such commodities, shall be fined not less than $10 nor more than $1000, or confined in the county jail not exceeding one year, or both; and all contracts made in violation of this section shall be considered gambling contracts, and shall be void."

The testimony of Cudahy, when called as a witness by the complainants, was, that when Wright proposed that they go into the deal together he said he could buy probably 150,000 or 160,000 barrels of pork and get the market short, and make his own price for the balance

over the pork actually in existence; that there were not above 75,000 barrels in the Chicago market. This was not denied by Wright except as to the quantity in the Chicago market, but he claimed that by the deal they intended merely to take advantage of the favorable condition of the market; that there was a short corn crop the year before and he counted on a short supply of hogs. The evidence tends to show that Wright and other members of the board of trade had reasonably accurate information as to the quantity of mess pork on the market in Chicago and other cities, and Wright himself testified that three-fourths of such pork was packed in Chicago. He knew that mess pork, to be what is called "regular," must be packed in a certain way and between October 1 and the first of the following April, and that the market could not be stocked with new pork after their operations were commenced, soon after the middle of April, and before the deal would be closed. On this branch of the case it is a strong circumstance tending to show that, whether Cudahy continued to be a partner with Wright or not, the scheme was to corner the market; that from 18,000 to 20,000 barrels of the pork purchased, and which was delivered through the Cudahy packing house, was taken out of the barrels by the direction of Cudahy and Wright,—at least with the knowledge and consent of both,—and made "irregular" by sawing the pieces through the ribs and re-packing, thus so changing its condition that it could not be delivered on contracts made on the board for "regular" mess pork, and reducing the amount of such pork on the market by the amount so changed. Wright testified that this was done so that the pork could not be shipped in again, re-sold and delivered to them; that he did not want to be buying and selling the same pork over and over again. In his testimony he defined a "corner" to be "where somebody succeeds in buying for future delivery more property of a given kind than is possible for the seller to deliver before the day of the

maturity of the contract." It is evident that that is precisely what he was attempting to do. By the attempt the market price of pork was advanced, and although the deal eventually proved unsuccessful, the attempt to corner the market, and the contract under which this attempt was made, were in direct conflict with the statute. *Samuels* v. *Oliver*, 130 Ill. 73.

It is insisted, however, that as the illegality of the contract was not set up as a defense in the answer, the court could not consider the evidence on that branch of the case. The testimony adduced on the part of complainant Wright himself tended strongly to show that the contract was illegal; but even if it had not, it was not error for the court to inquire into the nature of the contract which it was asked to enforce, and if it was found to be against public policy, or one prohibited by public law, to refuse to aid either party and leave them where they had placed themselves. The parties could not, whether by mistake or design, compel the court to adjudicate upon their alleged rights growing out of a contract void because against public policy or in violation of public law, by the simple process of narrowing their pleadings. The court itself had the right to know the nature of the contract it was called upon to enforce, and to deny all relief where it appeared that such contract was in violation of law or the public policy of the State, whether so alleged in the pleadings or not. To hold otherwise would subordinate the courts to the ingenious devices of men engaged in illegal and even criminal transactions, and compel them to carry out in the solemn forms of law, and by its resistless power, transactions which the same law had pronounced criminal and void. The citation of authorities ought not to be necessary to sustain the proposition that parties cannot compel a court of equity to enforce a contract appearing by the evidence to be illegal, by the simple device or inadvertence of omitting from the pleadings the charge of such illegality. In

refusing to enforce such contracts the court does not act for the benefit or for the preservation of the alleged rights of either party, but in the maintenance of its own dignity, the public good and the laws of the State.   (*Holman* v. *Johnson*, Cowp. 343.)   It may well be that had the trial court, under the pleadings, refused to investigate the question as to the legality of the contract, and had found for the complainants, the defendant could not have alleged such refusal as error.   But that question is not presented here.

It is also contended by appellee that the bill of complaint could not be maintained because there were no partnership assets to be accounted for and distributed, and the complainant Wright, not having paid more than his moiety of the partnership debts, was in no position to call upon his alleged partner for any accounting or relief whatever.   Inasmuch, however, as the evidence shows that the bill was properly dismissed on the hearing for want of equity, we have not thought it necessary to consider the sufficiency of the bill in the respect last mentioned.

The judgment of the Appellate Court will be affirmed.

*Judgment affirmed.*