(No. 18812.—)

VICTOR J. MILLER, Appellee, *vs.* THYRA P. OUSLEY, Appellant.

*Opinion filed February 20, 1929—Rehearing denied April 4, 1929.*

JACOBSON, MERRICK, LATTER & NIERMAN, (ROY C. MERRICK, and ALONZO H. RANES, of counsel,) for appellant.

PEDEN, KAHN & MURPHY, and ROONEY & MELANIPHY, (GERALD RYAN, and JOHN C. MELANIPHY, of counsel,) for appellee.

Mr. COMMISSIONER CROW reported this opinion:

On January 3, 1927, Victor J. Miller, appellee, filed a bill in equity in the circuit court of Cook county against appellant, Thyra P. Ousley, individually and as guardian

of her minor children, to establish a partnership between himself and Howard Ousley, deceased husband of Thyra, who held the title to the property by deed in joint tenancy with him, and that the court ascertain and decree the existence of the partnership as claimed; decree that title to the real estate is in fact and in equity in the partnership, and that any right, title or interest claimed by Mrs. Ousley is merely as trustee for and subject to the trust in favor of the partnership; that the court find and declare that, subject to the steps necessary for liquidating the assets, the partnership was dissolved by the death of Ousley and state an account, and require contribution, if necessary; that in case of any profits the court will order them disbursed in accordance with the partnership; that the court will order that the real estate be sold, and in case of failure of Mrs. Ousley to make a deed the court will require a master in chancery to make a deed for and on her behalf and on behalf of the partnership, complainant being ready and offering to join in any such deed or deeds; that the court will appoint a receiver and grant an injunction restraining her from interfering with the business and with the employees, her interference causing dissatisfaction, uncertainty and misapprehension among the employees, and for general relief. Defendant answered the bill, denying the partnership, and each and every allegation, with much particularity. The cause was referred to a master to take and report the evidence with his findings of fact and law, and that he recommend a decree. The master reported the evidence with his conclusions, and found the facts substantially as averred in the bill and recommended a decree as prayed. Objections to the report were overruled and stood as exceptions, which were overruled and a decree was rendered. Defendant, individually and as guardian of the infant children, prosecuted an appeal to this court.

The bill averred that on March 15, 1926, complainant and Howard Ousley agreed to form a partnership on equal

shares for the purchase of land and the erection and conducting of a service station thereon; that each should furnish half of the cost and the capital necessary to start its operation and share equally the profits and losses; that on March 25, 1926, Ousley advanced $5000, half of the cash payment on the cost of the land, and complainant half; that Mrs. Ousley knew of the amounts advanced and of the partnership venture and knew that the land was purchased with partnership funds for partnership purposes; that Ousley purchased the real estate with the partnership funds and caused the deed to be made to him and Mrs. Ousley as joint tenants, unknown to complainant; that the deed was dated March 30, 1926, and recorded April 1, 1926; that the property was purchased for $16,000, of which $10,000 was paid with partnership funds and a purchase money mortgage given for $6000; that complainant, not being familiar with the details of the purchase, did not know that title was conveyed to the Ousleys as joint tenants until December 24, 1926, after the death of Ousley; that complainant and Ousley erected a station building, driveways and other improvements on the land at a cost of $7000; that with the exception of about $1000 still due from the partnership, complainant paid one-half of the cost of the equipment into the partnership treasury and Ousley paid half, less the balance due; that to evidence the terms of the partnership complainant and Ousley entered into a contract, as follows:

*"June 6, 1926.*

"It is hereby agreed by and between Howard W. Ousley and Victor J. Miller, that they have on this date entered into an equal partnership of land and all property thereon, located at 9237-39-41 So. Chicago avenue, and known as Ousley's Service Station, and shall share all profits and losses equally.

Leo Peight. HOWARD W. OUSLEY,
 VICTOR J. MILLER."

—that all of the above facts and the agreement are well known to Mrs. Ousley; that thereafter the business was

conducted under the partnership name and large sums of money were earned as profits, to which complainant and Ousley were equally entitled; that on November 29, 1926, Ousley died intestate, leaving Thyra, his wife, and two children, his only heirs; that she claims that complainant was not a partner and claims to be the absolute owner of the real estate, and as administratrix claims to be the owner and entitled to possession of all property of the partnership and is trying to collect accounts receivable belonging to the partnership; that her claim has greatly interfered with the management and conduct of the business and the winding up of its affairs by complainant as surviving partner, and she has threatened to lease, encumber, sell, assign or otherwise cloud the title to the real estate; that by her unfounded and fraudulent claims she has interfered with the collection of sums due the partnership and induced persons to refuse to turn them over to complainant as surviving partner; that as a direct result of her actions she will cause great and irreparable injury to the property and the complete loss of the good will of the business.

Counsel contend that the burden of proving the partnership is not sustained. The contention is based upon the character of the evidence sustaining the fact.

There is no substantial controversy as to the facts. The negotiations between Ousley and Miller concerning the partnership began at Ousley's home about March 10, 1926. They discussed the purchase of the real estate which they afterwards bought and the building and conducting of a gasoline station. Mrs. Ousley knew that they were contemplating the purchase of the property. Neil Lykke, engaged in the real estate, insurance and loan business, had known Ousley all his life, employed him in his business, and he had charge of Lykke's office in his absence. Lykke became acquainted with Miller through Ousley in January, 1926, when he bought building and loan stock. About March 7, 1926, Miller and Ousley went to his office and

Miller gave Ousley $3036 to put in the safe for safekeeping. About March 15, 1926, Miller and Ousley had a talk with Lykke concerning the purchase of the property. He was agent for it and told them the price was $16,000. Ousley stated in Miller's presence that he and Miller were going into partnership and build a gasoline station; that each was putting up $5000. Lykke agreed to take a purchase money mortgage for $6000. A deposit of $3036 (the money left by Miller) was made on the purchase price. Ousley stated that they were going to run the business in his name only, as Miller did not want to be known. Miller had stock certificates in a building and loan association. On May 1, 1926, he went to the office and gave Lykke $400 and directed him to credit it on the station account. Lykke told Ousley that Miller had brought the money, and Ousley gave Lykke the building and loan certificates on May 1, 1926, Miller having previously endorsed them, and Lykke gave Ousley checks for the certificates. He endorsed the checks, amounting to $611.50, and the money was applied on the purchase price of the land. Lykke's ledger and journal show credits to the Ousley account as follows: March 17, 1926, $3036; March 25, $214; March 29, $3000; March 30, $100; May 1, $400 and $611.50. These amounts were paid by Miller. The credit of March 29 consisted of a cashier's check of March 26, 1926, payable to the order of Miller for $3000, which was endorsed by him and Lykke. Two of Miller's pay checks as policeman were endorsed and were credited to this account. The $3036 in currency brought in by Miller was delivered by Ousley, but as Miller wanted no receipt Lykke would not accept it, and it was put in the vault. A written contract for the purchase of the property was made, but Lykke did not remember whether it was in the name of Ousley or of Ousley and his wife. A fire in his office destroyed the contract and it was not produced at the hearing. Lykke owed Ousley $5000, which he paid by check, and it was endorsed by

Ousley and handed back to him and applied on the station account on March 30. On April 7 his account was credited with $679.50—the amount of building and loan stock held by him. Fowler, a salesman, and Wachdorf, an agent for a refining company; Mitchell, the contractor who built the station; Peight, employed to conduct the station,—all testified that in conversations Ousley stated that Miller was his partner but did not want to be known in it. Ousley continued to work in Lykke's office after the station was completed. His brother and Peight had charge of the station. Miller was at the station much of the time, usually in the evening, and all the evidence shows that he was active in the interest of the business. When money was necessary to pay installments on construction work he furnished it. This testimony was given by those who did the work and to whom the money was paid. Peight testified that on one occasion when Mrs. Ousley was at the station and Ousley was busy, she said she was sorry he got tied up in this thing with a partnership. She does not deny having made the statement. She testified that in a conversation at her home shortly after Ousley's death Miller said, " 'You know Howard and I are partners,' and I said, 'No, I didn't know.' This is the first I knew of it. He then said he had money in it. I said, 'Yes, I knew that.' "

After Ousley's death Mrs. Ousley asked Lykke to handle the station. He told her he would do so only after consulting Miller and if it was agreeable to him. She said that was satisfactory. He talked to Miller and managed the station for a month. Mrs. Ousley and Miller went to his office, and he told them the matter ought to be settled up, as he knew Miller had his interest in the business. He showed her the books containing the deposits of money and expenditures. He told her the conversations Miller and Ousley had with him when they closed the deal, that they were going to build a gasoline station; that they were partners and that Miller wanted to be a silent partner. In many

conversations and on different occasions Ousley stated that Miller was a partner—a silent partner. The station was opened for business on May 15, 1926. On June 6 the memorandum of contract was signed. Ousley had told Peight that day to come to his office after work. When Peight went to the office the door was locked and Ousley let him in. Miller was writing at a desk, and when he finished writing Ousley read the contract, said it was all right, and they signed it, and Peight signed as a witness. Jahnke, book-keeper for Lykke, testified to the genuineness of the signatures.

It is argued Lykke would have known of the contract if it existed, but that argument is nullified by the facts.

It is also argued that it was an unnecessary waste of time for Lykke to try to convince Mrs. Ousley of Miller's interest by the books if the contract was in existence. But the argument overlooks the fact that Lykke did not know of its existence. Then, it is asked, Why should Miller show her his private memorandum book, which the evidence shows he kept, if there was a contract? What his motive was for doing that proves nothing. If the contract was genuine, and it is fully established and not denied by any evidence in the record, it was executed before Ousley died, and there is no reason for saying it was executed at any other time than on June 6, shortly after the gasoline station was completed and began operations. The activity of Ousley in procuring its execution is consistent with no other conclusion than that it is a memorial of the fact of partnership between them.

The evidence establishes beyond a reasonable doubt that the co-partners furnished an equal amount of money with which to purchase the land on which the station was erected and to pay for its construction. There is no evidence that casts suspicion on the transaction or causes the mind to hesitate to believe that Miller and Ousley entered into a verbal agreement to engage as partners in the enterprise;

that the equitable title to the business was in them for partnership purposes; that Mrs. Ousley is not an interested purchaser or holder of the legal title for value without notice. All the evidence proves, with the cogency the rule in equity requires, that whatever title Mrs. Ousley has is held in trust for the partnership.

On the averments of the bill and the proofs in the record the children of Ousley were not proper or necessary parties. If a joint tenancy existed all title was in Mrs. Ousley after Ousley's death and the children would take nothing. "Where real estate is bought with partnership funds for partnership purposes and is applied to partnership uses or entered and carried in the accounts of the firm as a partnership asset it is deemed to be firm property, and in such case it makes no difference in a court of equity whether the title is vested in all the partners as tenants in common, or in one of them, or in a stranger. * * * If the real estate is purchased with partnership funds, the party holding the legal title will be regarded as holding it subject to a resulting trust in favor of the firm furnishing the money. In such case no agreement is necessary and the Statute of Frauds has no application." (*Robinson Bank* v. *Miller*, 153 Ill. 244, and authorities cited.) Here the partnership was dissolved by the death of Ousley. (Uniform Partnership act, sec. 31, clause 4.) There is no contention that a court of equity is without jurisdiction to determine the rights of the parties. The property being assets of the partnership, Mrs. Ousley, though a stranger to the partnership, holds the title in trust for its purposes and for the purpose of liquidation of its assets.

At the hearing before the master appellee was called as a witness on his own behalf and testified fully concerning the transaction between him and Ousley with regard to the partnership, its formation, and all matters with regard to the business. Appellant objected to his testifying before the master on the specific ground that he was not a compe-

tent witness, and the objection was overruled. The ruling of the master was preserved by an objection and carried as an exception before the chancellor. It is now contended that appellee was not a competent witness. Even if he were incompetent, the evidence in the record, independent of his testimony, amply supports the decree.

It is contended by appellant that the contract between appellee and Ousley is void because in contravention of public policy. Briefly stated, the basis for the contention is that Miller was a motorcycle policeman and by virtue of his office charged with the duty of enforcing traffic laws and ordinances in the city; that he did not wish to be known as having connection with the filling station; that patrons of gasoline stations are likely to violate traffic ordinances, and therefore the officer would, or might, compromise his duties as an officer with his opportunities for business. On cross-examination he explained his attitude. Inasmuch as he was a policeman he could not very well do justice to the place of business. He did not want to arrest speeders and lose a customer, neither did he want to allow them to go because they were customers. He testified that some whom he had arrested patronized the gasoline station. The case of *Crichfield* v. *Bermudez Asphalt Paving Co.* 174 Ill. 466, cited by appellant, fairly illustrates the application and limits of the principle. Agents were employed by a manufacturer of paving material for the purpose of promoting the asphalt paving business in a city. Their compensation depended on the amount of paving promoted by them and for which contracts were awarded by the city. It was held that the contract not being for the procurement of needed ·improvements but to enable the paving company to obtain contracts it was against public policy; that its tendency was evil and furnished temptation to use improper influence with public officials, whether the parties were actually guilty of improper conduct or not. In *Wright* v. *Cudahy,* 168 Ill. 86, the contract was declared void because in violation of

the Criminal Code. In *Estate of Ramsay* v. *Whitbeck,*
183 Ill. 550, it was held that an agreement by a State Treas-
urer with banks by which his account was credited with in-
terest on State funds was void as being in contravention of
public policy, and that the sureties on his bond must account
for public money so diverted. Other cases decided by this
court, and *Baldwin* v. *Coburn,* 39 Vt. 441, and *Kick* v.
*Merry,* 23 Mo. 72, are cited and quoted, but they are all
to the same effect: that a contract by a public official relat-
ing to a corrupt scheme concerning the business of his office
is contrary to public morals and void. They are all cases
where the actual consideration of the contract requires the
doing of an act which is in violation of law, or founded
upon an immoral consideration, or is opposed to public
policy, or tends to interfere with the administration of jus-
tice or corrupt public morals. The public policy of the
State is to be found in its constitution and statutes, and,
where they are silent, in its judicial decisions. (*Griffiths
& Son Co.* v. *Fireproofing Co.* 310 Ill. 331.) Nothing in
our constitution or statutes indicates that the transaction
of appellee is void as being against public morals. No limi-
tations placed upon similar transactions by decisions of this
court support the contention.

Counsel say appellant has always conceded that Miller
advanced money for her husband but denies that it was
as his share of partnership capital for the purchase of the
land or otherwise. The evidence in the record as to the
conduct of the parties is not compatible with a mere loan or
friendly advancement of money. It is in harmony with no
reasonable conclusion other than a partnership in the gaso-
line station enterprise, as charged in the bill.

The decree of the circuit court is affirmed.

Per CURIAM: The foregoing opinion reported by Mr.
Commissioner Crow is hereby adopted as the opinion of the
court, and judgment is entered in accordance therewith.

*Decree affirmed.*