(No. 35182.—

JOHN TARPOFF, Appellant, *vs.* HENRY D. KARANDJEFF *et al.,* Appellees.

*Opinion filed September 24, 1959—Rehearing denied Nov. 16, 1959.*

Hershey, J., dissenting.

Listeman and Bandy, of East St. Louis, (Charles H. Jungels, of counsel,) for appellant.

Fred P. Schuman, and Lueders & Robertson, both of Granite City, for appellees.

Mr. Justice Bristow delivered the opinion of the court:

John Tarpoff, plaintiff, brought this action in the circuit court of Madison County to impress a constructive trust on two parcels of real estate title to which is in the name of Henry D. Karandjeff, herein referred to as the defendant. At the conclusion of the plaintiff's case, the master-in-chancery recommended that the complaint be dismissed for want of equity, and the court entered a decree in accordance with that recommendation. A freehold is involved.

It is charged in the complaint filed on February 20, 1950, that the defendant fraudulently induced the plaintiff to convey his undivided one-half interest in the two improved business properties to him. It is claimed that there existed between plaintiff and defendant a fiduciary relationship, both

in fact and in law, and that this relationship was breached by the defendant resulting in the loss of the involved property, which property now should be impressed with the constructive trust.

Plaintiff, his wife, Pareskeva Tarpoff, and son Vasil were the principal witnesses testifying before the master-in-chancery who heard the evidence in this case in September and October, 1954, September and December, 1955, August and October, 1956. The defendant was called as an adverse witness under section 60 of the Civil Practice Act, (Ill. Rev. Stat. 1957, chap. 110, par. 60,) and was examined rather extensively. Since it is claimed here that the court below failed to properly evaluate the testimony adduced, overlooking completely its legal and evidentiary force, we are called upon to present the complete factual picture as revealed by this record.

Tarpoff and Karandjeff, natives of Macedonia, came to this country as mere boys early in this century. They soon became citizens of this country, married and each had three children. The defendant was a second cousin of plaintiff's wife. The two families were both living in Granite City, Illinois, and were extremely close socially, visiting back and forth frequently, always conversing in their native tongue. Plaintiff's boys would call the defendant Uncle Henry, and they referred to his children as their cousins. Defendant was an active Presbyterian and Sunday school teacher. He would often pick up plaintiff's children and take them to Sunday school. In 1927 the defendant visited plaintiff's relatives in Europe, and upon his return he exhibited movies of the occasion and talked freely of the hospitality and cordiality extended him by plaintiff's father and other relatives.

The defendant was enterprising and ambitious, was determined to receive an education, went to night school and applied himself industriously on the road to success. He was employed in the Granite City Trust & Savings Bank as a

bookkeeper, then as assistant cashier, cashier, trust officer and finally its president, all in a relatively brief period. On the other hand the plaintiff used his energies on a different course. He did not lack thrift, but was not interested in further education. He had only completed the second grade in Macedonia. He read, wrote, and spoke English with much difficulty. At first he worked in a machine shop, then opened a neighborhood grocery market, then started a slaughter house and meat packing business, selling meats to the neighborhood groceries at more or less wholesale. This was his principal business for many years. It appears that, notwithstanding his limited schooling, he was fairly successful financially.

In 1915 the defendant prevailed upon the plaintiff to transfer his bank account from the First National Bank of Granite City to the Granite City Trust & Savings Bank. There defendant would frequently help plaintiff in making his deposits, occasionally writing checks for him, advising him in real estate transactions, and serving on ten occasions between 1921 and 1927 as a notary public where plaintiff was either the grantor or grantee. In light of the foregoing it is most natural that plaintiff should have a high regard for his fellow countryman who had become one of the leaders in this small community. He had confidence in his integrity and business judgment.

With this in mind let us move on to the first transaction that ultimately led to difficulties. In 1922 these parties purchased a rental business property in the heart of Granite City for the sum of $18,750, taking the title in themselves as tenants in common. It was a two-story building with store rooms on the first floor and offices on the second floor. The defendant secured a loan of $9,000 at his bank, but because he did not have the available cash to pay his share of the balance of the purchase price the plaintiff loaned him $2,000, taking his note bearing 6 per cent interest, which note was not repaid until July, 1927. This business enter-

prise was entered into at the suggestion of the defendant; however, there is no claim that the plaintiff had been over-reached in any way. It was agreed that plaintiff would look after the matter of repairs on the building and the defendant would take charge of the business end, such as negotiating leases, collecting rents and keeping a record. He kept the income from the building in a partnership account at his bank. Three years later plaintiff and defendant increased their project by purchasing two lots adjoining their building and erecting thereon another business property. The·purchase price of the two lots was $6400, one half of which was paid in cash, the remainder was secured by a mortgage on the tract. Again the defendant borrowed his share of the down payment from the plaintiff, and also borrowed another $600 about that time from the plaintiff. All loans were represented by promissory notes bearing 6 per cent interest, and all were paid off in due course.

In 1926 a two-story brick building was erected on the lots at the cost of $18,000. Since there were other expenses of considerable size, a new mortgage was negotiated in the sum of $35,000 which covered the liquidation of the building costs as well as the two existing mortgages in the sum of $9,000 and $3,200. All negotiations for the loans were handled by the defendant. He kept all the papers, collected the rents and purportedly applied the proceeds to the payment of interest and expenses.

In the early thirties came the recession which created some problems. Rents declined and delinquencies in the payment under the mortgages occasioned some refinancing. On November 1, 1935, the parties borrowed $14,000, by giving a second mortgage on the buildings to defendant's bank, as trustee, but the money actually came from Maum Gitcho, a cousin of defendant and a relative of plaintiff's wife. Gitcho, allegedly, did not want plaintiff to know that he had made this loan. The proceeds of this loan were applied on the balance due the holder of the first mortgage and reduced

that indebtedness to $19,000. In 1939 the total indebtedness of the parties was $38,781.63, including the $19,000 first mortgage, the $14,000 second mortgage.

In the month of February, 1940, the defendant came to plaintiff's home where, in the presence of the plaintiff, his wife and adult son Vasil he stated: "I got bad news" and presented essentially the following proposition: "We owe $48,000 on our property, the holders of the mortgages are demanding payment, if they foreclose they will ruin the both of us, they will take your home and your business and ruin my name as president of the bank. I have a friend Mr. X who can rescue us for $5,000. He will take the property off of our hands, pay all outstanding liens and save us from financial disaster and protect my name." Many times the defendant was asked by plaintiff, his wife and Vasil who this good Samaritan might be, but steadfastly the defendant insisted that his name must be kept a secret and that this entire arrangement must be kept secret. The plaintiff and his family were shocked and saddened by this news. Tarpoff did not want to surrender the property that they had managed to hold on to all through the thirties and stated that he could raise $5,000 and asked if that would not appease the creditors. The defendant said "That is impossible, we cannot do it." The plaintiff then suggested that an effort be made to sell the buildings or negotiate a new loan. The defendant said that was impossible, that the buildings are only worth at most $75,000 and that figure would not justify a $48,000 loan. The foregoing is only a brief but fair synopsis of what was said in the course of the three hours in the plaintiff's home in February, 1940. However, shortly thereafter the deeds were executed and the plaintiff paid his share of the $5,000, supposedly for the benefit of Mr. X.

Bernice Jilek, who was a notary public in the defendant's bank is alleged to have taken the acknowledgment on each deed, but there is no claim that she was ever in the Tarpoff home. It is claimed by the plaintiff that the deeds did not

contain the names of any grantee. The wife and Vasil supported this contention. Nevertheless, defendant testified that the deeds did contain the names of himself and his wife as grantees, and that he exhibited to plaintiff evidence of the cancellation of the mortgage indebtedness, thus exonerating plaintiff from all liability on the mortgages executed by them on the property.

Friendly relations continued between plaintiff and defendant and their families until 1946 or 1947 when Vasil returned from war and only by accident discovered that defendant was collecting the rents on the buildings in question and that the real Mr. X had been defendant himself. A lawyer was employed, investigations commenced, friendly relations discontinued, and these proceedings instituted.

The deeds in question were recorded in April, 1940, and on July 1, 1940, the defendant negotiated a loan on the property in the sum of $28,000. The $19,000 first mortgage was extinguished and Gitcho was paid $9,000 on his $14,000 indebtedness. His mortgage was released and the balance due him was evidenced by a promissory note secured by some stock that the defendant owned in a oil company.

The defendant was given a full opportunity in his examination under section 60 to explain his conduct in this matter. He stated that Gitcho and others who assisted him in the refinancing of these buildings would not help him if it also helped the plaintiff. He was searchingly examined concerning the actual imminence of foreclosure proceedings. He first said the foreclosure papers had been prepared—implying at first that he had actually seen them—then he retreated from that position by saying that his attorney had told him of the threatened action. He was then asked if he had received any written demands or notices of threats that foreclosure proceedings were contemplated by the owner of the first mortgage. He said that he thought he might have received such letters in writing, but was not sure. It is important to note that he never claimed that he exhibited such

writings to the plaintiff and his family when he was selling them on the idea that financial disaster was inevitable, nor did he claim that he had any such writings to produce in court. Also somewhat elusive was defendant in his testimony concerning his efforts at selling the joint property and thus possibly avoiding a complete loss of their investment. He never listed the property with anyone nor publicly advertised it for sale. He thought to do so would adversely affect his prestige as a bank president. He did however, seek a buyer quietly by asking several people if they wanted to buy. When asked for their names they were either people who were already dead or close bosom friends who strangely were willing to assist the defendant but not the plaintiff in his refinancing. Less than frank was the defendant when he testified that he was able to obtain financial assistance for himself alone, and not the partnership, and it does not appear the defendant made an all out and sincere effort to sell this property. We do not believe the defendant was altogether candid when he told the plaintiff that they were going to be wiped out by foreclosure proceedings.

We must bear in mind that the first mortgage had already been reduced from $35,000 to $19,000 and the payments on this obligation were practically current, also the fact that the holder of the second mortgage, although known to the plaintiff, was a close friend of the plaintiff and a relative of plaintiff's wife. Not being unmindful of defendant's prestige as the president of a banking institution, and having in mind that the plaintiff offered to pay $5,000 on their joint obligations, and assuming that the defendant would have produced a like amount, it would seem to us that had the defendant honestly tried he could have maneuvered their financing, so that their investment would have survived the depression.

The master in chancery held that plaintiff should not prevail in this matter because the complaint had failed to allege the relationship of the plaintiff and the defendant by

name, in that there was a failure to say whether there was a partnership or a joint venture. However, when plaintiff's counsel sought to amend his complaint to comply with this erroneous notion, his motion was denied. It is significant to note that the defendant throughout his testimony referred to the plaintiff either as his partner or his joint adventurer. It is not necessary that the complaint label the relationship by some special nomenclature, such as partnership or joint adventure. Equity will always look to the substance of the transaction and the relationship of the parties, rather than the name they adopt for their enterprise. In *Carroll* v. *Caldwell*, 12 Ill.2d 487, in dealing with this problem the court, at page 495, said: "The complaint makes no attempt to place a legal or technical label on the business relationship. This, however, is not fatal. Equity looks to the substance of a transaction, not its form, and to this end numerous courts have held that fiducial relationships do not depend on nomenclature. See 89 C.J.S. Trusts, sec. 151, note 92; pp. 1055-1056; *Ditis* v. *Ahlvin Construction Co.* 408 Ill. 416."

*Laches* and the five-year statute of limitation are two defenses heavily relied upon by the defendant in his brief. Where a cause of action in equity is based upon fraud, the Statute of Limitations will not begin to run nor *laches* apply until discovery of the fraud or such time it should have been discovered if reasonable diligence had been exercised. In *Moneta* v. *Hoffman*, 249 Ill. 56, at page 71, this court said: "There is no *laches* where there is no knowledge, and delay will not bar relief where the injured party was ignorant of the fraud." In *Duncan* v. *Dazey*, 318 Ill. 500 at 525, "There can be no *laches* where there is no knowledge, and mere delay will not bar relief where the injured party was ignorant of the fraud and filed his bill within a reasonable time after acquiring knowledge of it." In *Lutyens* v. *Aldrich*, 308 Ill. 11, at page 21 this court said: "Mere delay

will not constitute *laches,* but the delay must be such as to work to the disadvantage of the other party (10 R.C.L. 396)". It does not appear that the delay here has worked to the disadvantage of the defendant in assuming the burden of proving that he was honest and fair with the plaintiff. It is completely reasonable to understand why plaintiff did not discover the alleged fraud until 1947. Ordinarily you might say that the proposals of the defendant as presented to the plaintiff and his family in February, 1940, would excite suspicion, if not curiosity, and cause one to search the records and make inquiry. But not necessarily so here. The plaintiff had a deep and abiding trust in the defendant, and his confidence in him was so complete that it forbade any thought that he was being betrayed.

This action was commenced within five years after the alleged fraud was discovered, and, under the circumstances here appearing, is not barred by the five-year statute of limitation. The lower court was in error in sustaining defendant's motion to dismiss this action at the close of the plaintiff's case. Fiduciary relationship is usually characterized by a situation where there is confidence and trust reposed on one side and a resulting domination and influence on the other. If the dominant party gains an advantage in the transfer of real estate, he is called upon to prove the fairness of the transaction by convincing evidence. *McCartney* v. *McCartney,* 8 Ill.2d 494, 499; *Doner* v. *Phoenix Joint Stock Land Bank,* 381 Ill. 106, 113; *Burroughs* v. *Mefford,* 387 Ill. 461, 465.

This decree is reversed and the cause remanded to the circuit court with directions to deny defendant's motion to dismiss.

*Reversed and remanded, with directions.*

Mr. JUSTICE HERSHEY, dissenting:

A full and complete review of all of the pleadings and all of the evidence presented in this case compels me to dissent to the opinion of the majority. Plaintiff asserts:

(1) a violation of a fiduciary relationship, and (2) a reliance upon a constructive trust.

Plaintiff had the burden of proving the existence of the fiduciary relationship upon which he relies. That relationship cannot be established by the failure of defendants to prove that it did not exist. Plaintiff's evidence fails to show more than the facts that the parties' families were distantly related, that both men emigrated to this country together, that they were close friends, and that they mutually entered into business relationships and transactions. The plaintiff's evidence is singularly devoid of proof that he placed such reliance and confidence in defendant, Henry D. Karandjeff, that a fiduciary relationship arose, wherein defendant obtained a superior or dominant relation to plaintiff. The relationship alleged by the plaintiff is not proved by the evidence. The master so found, and the court so decreed. The findings of the master, adopted by the circuit court, are not manifestly against the weight of the evidence, and should, therefore, not be disturbed here.

Plaintiff relies upon a theory of the existence of a constructive trust. The majority opinion deals solely with the defense of *laches* and does not consider the application of the Statute of Limitations. We have held that only express trusts are exempt from the bar of the five-year statute of limitations or of *laches*, (Ill. Rev. Stat. 1957, chap. 83, par. 16,) and that constructive trusts are subject to limitation or *laches* after a lapse of five years without action. (*Schreiner* v. *City of Chicago*, 406 Ill. 75; *Lancaster* v. *Springer*, 239 Ill. 472; *Anderson* v. *Lybeck*, 15 Ill.2d 227.) No repudiation of the constructive trust, if any, was necessary to set the statute in operation.

The deeds in question were executed on February 20, 1940, and were recorded in Madison County, Illinois, on April 6, 1940. Whether plaintiff knew of the recording or not, they were then public records and plaintiff is charged with knowledge of them. (*Miller* v. *Siwicki*, 8 Ill.2d 362;

*Skordzki* v. *Sherman State Bank,* 348 Ill. 403; *Johnson* v. *Fulkerson,* 12 Ill.2d 69.) There could be no fraudulent concealment subsequent to the recording.

This complaint was not filed until February 20, 1950. Almost ten years had elapsed since the plaintiff received at least constructive knowledge of the deeds. The five-year statute of limitations is a complete bar to the present cause for establishment of a constructive trust. None of the cases upon which the majority relies involved a constructive trust.

Plaintiff admits actual knowledge in the years 1946 or 1947 of the existence of these deeds. The fraud, if any, upon which plaintiff and the majority opinion rely was not concealed after April of 1940. That fraud, if any, should have been known by plaintiff upon the recording of the deeds. It is not now available to bar the application of the doctrine of *laches* or the statute of limitations, for it was not concealed during the ten years prior to the filing of this suit. Plaintiff had the burden of exercising reasonable diligence to discover the fraud now claimed. That diligence was not exercised if the plaintiff was unaware of his cause of action until 1946 or 1947.

This cause is barred by both *laches* and the statute of limitations and its dismissal should be affirmed.