William P. Higgins, Plaintiff, Counter-Defendant Appellee, v. Thomas Higgins, et al., Defendants, Counter-Plaintiffs Appellants.

Gen. No. 50,130.

First District, Third Division.

June 23, 1966.

John H. Galgano and Patrick A. Barton, of Chicago, for appellants.

John W. Vescelus, of Wheaton, for appellee.

MR. JUSTICE DEMPSEY delivered the opinion of the court.

The defendants, Thomas Higgins and his brothers and sisters, appeal from a decree of the Circuit Court which found that a partnership had existed between their deceased father, James M. Higgins, and their uncle, William P. Higgins, the plaintiff, and which further found that the partnership was the owner, in equity, of ten lots at the corner of 31st Place and Wolcott Street in Chicago which comprised the partnership business

premises. An appeal was taken to the Supreme Court which transferred the cause here.

In 1951 William P. Higgins filed a complaint for partition of five of the ten lots. As to parcel I, consisting of three lots, he alleged ownership of a one-half interest by descent from his father, J. M. Higgins, who he alleged acquired title thereto under a deed executed in 1893 and recorded in 1906. As to parcel II, consisting of two lots, he alleged ownership of a one-half interest under a deed to himself and his brother, James M. Higgins, which was executed and recorded in 1910. The defendants answered, admitting William's interest in parcel II, but denying his interest in parcel I on the theory that the J. M. Higgins who acquired title under the 1893 deed was their father and not their grandfather. Thereafter, in 1954, William filed an amended complaint for dissolution of the partnership, an accounting, and for partition not only of the five lots involved in his original complaint, but also of five additional lots across the street which were designated as parcels III and IV. He alleged that he and his brother James formed a partnership in 1898 under the name of Higgins Bros. to carry on a cooperage business originated by their father in 1885 and that when the partnership was formed, his father, J. M. Higgins, made a gift of parcel I to the partnership. The partnership was alleged to have continued until 1935 when James died. He alleged that parcels III and IV were purchased with partnership funds for use in the partnership business, but that title thereto was taken in the name of his brother only under deeds recorded in 1916 and 1919. The defendants denied these allegations and set up the statute of limitations and laches as defenses.

Hearings before a master in chancery commenced in 1955. 7,477 pages of testimony were taken and 633 exhibits were received. The master's report found that a partnership did exist between William and James which

182

was dissolved in 1935 upon the death of James; that all of the lots were the property of the partnership; that the plaintiff, as surviving partner, had the duty to wind up the affairs of the partnership and liquidate the ten lots, distributing the proceeds one-half to himself and one-half to the defendants as the heirs of James. The master further found that the plaintiff was barred from an accounting of the partnership affairs by reason of laches. The decree of the chancellor incorporated all of the findings of fact made by the master and approved and confirmed his findings of fact and conclusions of law, and relief was decreed accordingly.

The appellants' first contention is that evidence incompetent by reason of the Evidence Act (Ill Rev Stats, c 51, §§ 2 and 3 (1955)) was received and considered by the master. It appears that shortly after the plaintiff had commenced testifying on preliminary matters, the defendants objected to his competency as a witness. All of the plaintiff's subsequent testimony was heard subject to the objection, a practice which the master found approved by Wylie v. Bushnell, 277 Ill 484, 115 NE 618 (1917) and Peck v. Peck, 16 Ill2d 268, 157 NE2d 249 (1959). In arriving at his findings of fact, the master stated that he excluded from consideration all of the testimony of the plaintiff except (1) testimony received prior to the objection; (2) testimony relating to the fact of discovery of documents, books and records of the partnership subsequent to the death of his brother; (3) testimony in identification of these papers and (4) testimony relating to the transaction of a mortgage, which was considered for the limited purpose of determining its validity as a charge against five of the lots. The master concluded that the competent evidence in the record fully supported his findings of fact.

■ There is no question that the master properly considered the testimony received prior to the objection and that which related to events occurring after the death

183

of James. The propriety of the testimony as to the mortgage and the conclusion of the master and chancellor that the mortgage was invalid have not been appealed and are not involved here. The appellants contend, however, that the master permitted the plaintiff to testify (while he was identifying the documents discovered) concerning events, conversations and the circumstances surrounding the documents in violation of the statute. They do not argue that the identification of the documents by the plaintiff was improper.

 We agree with the appellants in their contention. The testimony of the plaintiff considered by the master should have been limited to preliminary proof necessary to establish the authenticity of the documentary evidence. Cf. Rude v. Seibert, 22 Ill App2d 477, 161 NE2d 39 (1959); Alling v. Brazee, 27 Ill App 595 (1888). But the mere presence of incompetent testimony in the record does not constitute reversible error, if there is sufficient competent evidence to support the master's conclusion. Miller v. Ousley, 334 Ill 183, 165 NE 629 (1929). We will, therefore, consider only the competent evidence in the record, applying thereto the rule that the findings of the master, when approved by the chancellor, will not be disturbed unless they are against the manifest weight of the evidence. Gallagher v. Girote, 23 Ill2d 170, 177 NE2d 103 (1961); Barker v. Barker, 36 Ill App2d 20, 183 NE2d 518 (1962); Pedi v. Jagiencarz, 25 Ill App2d 467, 167 NE2d 447 (1960).

The plaintiff's evidence mainly consists of the retained documents and records of the Higgins Bros. business, the examination of adverse witnesses and the facts elicited on cross-examination of the defendants' witnesses. This evidence discloses that J. M. Higgins, the father of the plaintiff and the grandfather of the defendants, was a cooper. The earliest retained record is a business card describing him as a dealer (singular) in secondhand barrels and coopers' stock on 34th Street in Chicago.

The business moved about 1893 to the premises on 31st Place which comprises parcel I of the real estate involved here, and a business card of that era shows this place of business, carries the telephone number Yards 795 and states that the business was established in 1885. In 1885 William was 11 years old and his brother James was 17.

In 1893 J. M. Higgins moved his residence to the 31st Place address and William moved with him. James moved to this address with his wife when the cooperage shop on the premises was completed. William resided there until his marriage, but James continued to live there until his death and his residence was also the office of the business.

J. M. Higgins died in 1903 but prior to his death there had been a change in the structure of the business. A bankbook of 1902 relates to the account of Higgins Bros. with the address of the firm being the 31st Place address. The earliest business card of Higgins Bros. carries the same telephone number as that of J. M. Higgins at the same address, describes their business as wholesale dealers (plural) and bears the statement that the business was founded in 1885. From these facts, the master concluded that Higgins Bros. as a business entity succeeded to the business of J. M. Higgins prior to his death.

As to the relationship of the plaintiff and his brother in the business of Higgins Bros., documents in evidence disclose: (1) a lease of premises on Archer Avenue to William and James (these premises were described on a business card of Higgins Bros. as one of the addresses of the business); (2) a statement to their bank, signed by William and James, opening an account under the name of Higgins Bros., wherein they described themselves as the only members of the firm or copartnership; (3) various bank loans where the brothers were joint obligors, correspondence concerning the loans addressed to both

brothers, and a charge to the account of Higgins Bros. applied as a credit against one of their joint notes; (4) expired insurance policies on the buildings, horses and automobiles of Higgins Bros., and billings thereon to James and William, including in some of them reference to the brothers doing business as Higgins Bros.; (5) billings by the telephone company to James and William for the firm telephone; (6) a lawsuit against both brothers doing business as Higgins Bros.; (7) another suit where James was sued individually as doing business as Higgins Bros. (as to this suit there was a receipt from the creditor to William evidencing part payment of the claim) and (8) although most of the books of Higgins Bros. had been destroyed, one entry in the handwriting of the firm bookkeeper established an equal sharing of profits for the year 1918 for income tax purposes.

■ ■ There is, of course, evidence to the contrary. There are numerous records from the years immediately prior to the death of James which tend to show that he carried on business individually under the name of Higgins Bros. There is the testimony of witnesses, chiefly employees of Higgins Bros. and dealers in the same line of business, who testified in the main that William was an employee and that James was the boss and that they dealt with James as the sole owner of the business. However, they also admitted that they had no firsthand knowledge of the private business relationship between the brothers. There is also the evidence that in making an application for public assistance in 1941, William stated that he had been employed by his brother as a cooper from 1925 to 1935 and prior to that time was in the cooperage business for himself. Such an admission is not conclusive and may be considered by the trier of fact in connection with all the evidence in the case. Dufield v. Cross, 12 Ill 397 (1851); Ayers v. Metcalf, 39 Ill 307 (1866). It is not conclusive here where the defendants'

186

witnesses testified to his unbroken connection with the Higgins Bros. business since the 1890's.

■ There is sufficient evidence in the record to show a sharing of the profits of the business of Higgins Bros., a holding out to the business world of a partnership relation, and an agreement between the brothers to be partners in the business. The finding of the master that a partnership existed was not against the manifest weight of the evidence.

The evidence shows that James was the dominant figure in the partnership. He was older, better educated, resided on the business premises and gave orders to his brother. For many years his wife was the firm's bookkeeper. He had complete charge of the business office and of the financial affairs of the partnership while William was supervisor of the yard and drivers. The evidence further shows that to some extent James overreached his brother in financial affairs, particularly when in 1910 he attempted to have the title to parcel II of the real estate conveyed into his own name, although both he and his brother had signed the contract for its purchase.

■ As to parcels III and IV of the real estate, the evidence shows a conveyance to James and his wife. It further shows that the premises were used exclusively in the business of Higgins Bros., that insurance premiums and real estate taxes thereon were paid by Higgins Bros., that insurance proceeds from a fire loss on these premises were paid to Higgins Bros. and used to reconstruct the improvements. It further shows that in 1921 both brothers protested a proposed local improvement, signing their names as co-owners of all the premises involved in this litigation. No direct proof exists as to the source of funds for the purchase of these parcels, and the contracts for their purchase were made by James individually. However, we think the inference is strong that the premises were bought exclusively for use in the partner-

187

ship business and paid for with partnership funds, bearing in mind both the previous attempt by James to have parcel II conveyed into his own name despite his brother's contract interest, and the subsequent charging of the expenses on these parcels to the partnership.

The statute provides that unless the contrary intention appears, property acquired with partnership funds is partnership property. Ill Rev Stats c 106½, par 8(2) (1955). In Korziuk v. Korziuk, 13 Ill2d 238, 148 NE2d 727 (1958) the court stated the following:

> "Where real estate is bought with partnership funds for partnership purposes, and is applied to partnership uses or entered or carried on the account of the firm as a partnership asset, it is deemed to be firm property and, in such cases, it makes no difference in a court of equity, whether the title is in all the partners, in one of them, or in a stranger. If the real estate is purchased with partnership funds, the party holding the legal title will be regarded as holding it subject to a resulting trust in favor of the firm furnishing the money."

We think the competent evidence in the record brings the present case within the above rule and that the finding of the master that these lots were partnership property was not against the manifest weight of the evidence.

Much of the same evidence is relevant to the question of whether parcel I was firm property. As to this parcel, the plaintiff seeks to raise a constructive trust to prevent the heirs of James from obtaining the benefit of any advantage secured by reason of his breach of fiduciary duty and fraud. Compton v. Compton, 414 Ill 149, 111 NE2d 109 (1953). The evidence we have mentioned shows that James occupied a fiduciary relationship toward his brother by reason of his dominant position in the partnership and his control over its financial affairs.

The evidence of the plaintiff tends to show an abuse of this relationship both in claiming title to the parcel individually and in appropriating partnership assets for its maintenance. Once the fiduciary relationship is shown to exist, the burden of proving by convincing evidence the propriety, fairness and validity of the acquisition of the title is upon the fiduciary. Tarpoff v. Karandjeff, 17 Ill2d 462, 162 NE2d 1 (1959).

 This burden the appellants attempt to meet by showing that the J. M. Higgins who acquired title to this parcel in 1893 was their father. This was prior to the formation of the partnership, and proof of their contention would negate the existence of any fiduciary duty in respect to this parcel. They introduced evidence tending to show that their father's signature appeared on a trust deed and trust deed note executed contemporaneously with the execution of the deed to the parcel, and that their father and mother unquestionably signed another trust deed upon the parcel in 1902 during the lifetime of the senior J. M. Higgins. However, the trust deed note signed by James M. Higgins and payable to the grantor recited on the reverse side of the note payment by J. M. Higgins. The master found that James never signed his name in that form and that the note was not conclusive proof that he was the grantee. Moreover, for a period after 1938 five of the lots, including parcel I, were leased and the rental was paid to the plaintiff. In addition, the family and business circumstances existing in 1893 tend to support a conclusion that the grandfather was the grantee in the deed, and there is also a presumption that where a father and son have the same name, and a conveyance leaves it uncertain whether the grant is to one or the other, in the absence of proof to the contrary, the father will be presumed to be the grantee. Doty v. Doty, 159 Ill 46, 42 NE 174 (1895). In our opinion, the evidence as to this parcel would support a finding in favor of either party, and we are unable

to say that the master's and chancellor's findings are against the manifest weight of the evidence.

The defendants' next contention is that laches and the five year statute of limitations (Ill Rev Stats, c 83, par 16 (1955)) applicable to actions to establish resulting and constructive trusts bar the plaintiff's action. (Schreiner v. City of Chicago, 406 Ill 75, 92 NE2d 133 (1950)). The master and chancellor found that laches barred the plaintiff's claim for an accounting from the beginning of the partnership to its dissolution in 1935, and the defendants contend that this finding should also bar the action to impress a trust on the partnership real estate. However, this finding was based upon the futility of ordering an accounting as of the time of the dissolution of the partnership in 1935 because the books and records were largely lost or destroyed and the witnesses deceased, as well as upon the plaintiff's delay in prosecuting his claim particularly in view of the fact that he had many of the remaining records in his possession since 1937. The same considerations are not necessarily applicable to an action to impose a trust upon the real estate.

After the death of James, his son Frank, with the tacit acquiescence of the other children of James, operated the business. Frank told William that his brothers and sisters agreed that Frank should continue to run his deceased father's share. The master found that no new partnership was formed between William and Frank, but that the business continued under the name of Higgins Bros. This relationship continued until 1945 when William dissociated himself from the business entirely. Frank was dominant in his relationship and handled the income and profits of the business. During a part of this period William received rents from five of the lots, while the business was carried on from the remaining five lots. Throughout this relationship, William's participation in the business and his income therefrom grew successively less. In 1946 and 1947 he re-

190

■■■■

quested his share of the profits, but was told by Frank that there were none. Finally, in 1949, he proposed that the real estate and business be sold. Frank then told him that he had no interest in either the property or the business. This repudiation instigated the instant action.

■■■ Frank Higgins' statement as to his own authority to continue running his father's share of the business was both an inducement to let the business continue and a representation that William Higgins had an interest in the business and his interest would be recognized. Although it was William's duty as the surviving partner to liquidate the business, economic conditions at that time, his own lack of education, legal knowledge and experience in any other business, taken together with the assurance that the business would continue and his interest therein continue, excuse his failure to do so. Under these circumstances, we think the statute of limitations and laches were tolled until the time Frank denied that William had an interest in the property. We consider Frank's assurances in the light of his subsequent denial, to be a misrepresentation of his true position; his true position is evidenced by a voluntary tax foreclosure proceeding instituted by him in 1947 to which William was not a party although an owner of record to two of the lots foreclosed. The applicable rule is stated in Anderson v. Lybeck, 15 Ill2d 227, 154 NE2d 259 (1958):

> "Where beneficiaries of an implied or constructive trust are assured of the acknowledgment and continuance of the trust, the Statute of Limitations will not apply, and where that assurance amounts to a misrepresentation or fraud, the bar of the statute or laches will not apply until after the discovery of the fraud."

This action was commenced within a reasonable time after the plaintiff discovered that the defendants were

191

denying that he had an interest in the ten lots, and the chancellor was correct in finding that the plaintiff's claim was barred neither by laches nor by the statute of limitations. The decree of the Circuit Court is affirmed.

Affirmed.

SULLIVAN, P. J. and SCHWARTZ, J., concur.