# MERCHANTS MORTGAGE COMPANY
## ET AL. *v.* LUBOW

[No. 193, September Term, 1974.]

*Decided June 16, 1975.*

The cause was argued before MURPHY, C. J., and SINGLEY, SMITH, DIGGES, LEVINE, ELDRIDGE and O'DONNELL, JJ.

*Lawrence F. Rodowsky* and *M. Peter Moser,* with whom were *Eleanor M. Carey* and *Frank, Bernstein, Conaway & Goldman* on the brief, for appellants.

*David Freishtat* for appellee.

SINGLEY, J., delivered the opinion of the Court.

On 25 November 1968, Merchants Mortgage Company (Merchants) filed in the Circuit Court of Baltimore City a

bill of complaint against Ralph Lubow, at one time an employee and later an officer and director of Merchants, alleging a breach of Lubow's duty of loyalty, and seeking discovery, an accounting and other relief. As filed, the complaint joined Sol M. Bank as a co-defendant. By a second amended bill of complaint, filed in March, 1970, Eugene J. Silverman, J. Elmer Weisheit, Jr., Title Company of Maryland, Inc. (now Columbia Title Company), and Pacy Oletsky were added as defendants, and additional claims were asserted. LeRoy E. Hoffberger and Morton J. Hollander, partners in the law firm of Hoffberger and Hollander, which had been Silverman's employer, were added as plaintiffs.

Only Lubow, of all the defendants, filed a motion for partial summary judgment, grounded on the contention that claims based on wrongs which were alleged to have occurred prior to 25 November 1965 were barred by limitations; that certain of the claims were not supported by sufficient evidence, and that others were barred by preclusion.[1]

Merchants countered the motion for partial summary judgment with an answer, and a motion for the production of documents by Lubow, which had as its purpose the examination of his financial records.

The matter was referred to Harry M. Sachs, Jr., the General Equity Master of the Supreme Bench of Baltimore City, for hearing on the motions. He recommended that summary judgment be granted for Lubow on those claims which were barred by limitations, by preclusion, or were not supported by sufficient evidence, and that limited discovery

---

1. Our cases have used the phrase estoppel by pleading, *see* Van Royen v. Lacey, 266 Md. 649, 296 A. 2d 426 (1972); Scanlon v. Walshe, 81 Md. 118, 31 A. 498 (1895). *See also* Restatement of Judgments § 68 at 293 (1942); Tentative Draft No. 2, Restatement (Second) of Judgments § 68 at 103, § 82 at 39, § 88 at 89 (1975).

The notion that mutuality or privity was a prerequisite to the assertion of the plea of res judicata was dispelled by Justice Traynor, for the California Supreme Court, in Bernhard v. Bank of America, 19 Cal. 2d 807, 812, 122 P. 2d 892, 894-95 (1942) and finally laid to rest in Blonder-Tongue Laboratories, Inc. v. University of Illinois Foundation, 402 U. S. 313, 328-29 (1971). *See* State of Maryland v. Capital Airlines, Inc., 267 F. Supp. 298, 302-05 (D. Md. 1967) and Pat Perusse Realty v. Lingo, 249 Md. 33, 44-45, 238 A. 2d 100, 107 (1968).

be granted. Merchants filed exceptions to the recommendations of the Master; Lubow did not. From orders of the circuit court entering partial summary judgment for Lubow, and limiting discovery by Merchants, both Merchants and Lubow appealed to the Court of Special Appeals. We granted certiorari in order that we might consider the matter.

It should be noted that Merchants at this stage of the proceeding could appeal only by virtue of an order entered by the chancellor.

Maryland Rule 605 a provides:

> "Where more than one claim for relief is presented in an action, whether as an original claim, counterclaim, cross-claim, or third-party claim, the court may direct the entry of a final judgment upon one or more but less than all of the claims only upon an express determination that there is no just reason for delay and upon an express direction for the entry of judgment. In the absence of such determination and direction, any order or other form of decision, however designated, which adjudicates less than all the claims shall not terminate the action as to any of the claims, and the order or other form of decision is subject to revision at any time before the entry of judgment adjudicating all the claims."

In the order granting Lubow's motion for summary judgment on "some but less than all of the claims of the plaintiff [Merchants] against the defendant Lubow" the court specified, in pursuance of the Rule, that this was a final judgment and that there was no just reason for delay.

The thrust of Lubow's cross-appeal is that the lower court erred (i) in adopting the Master's recommendation that estoppel was not available as a defense to four of the claims asserted by Merchants against Lubow; (ii) in rejecting the Master's conclusion that the doctrine of preclusion was available to Lubow as a defense to those claims, and (iii) in

failing to hold that 10 other claims were barred by the doctrine of equitable estoppel.

Merchants has moved to dismiss Lubow's cross-appeal, a motion which we shall grant. The point is that a *denial* of Lubow's motion for summary judgment is an interlocutory order, which is not appealable and cannot be made so, *Lawrence v. Department of Health,* 247 Md. 367, 371-72, 231 A. 2d 46, 48-49 (1967). It is not a final adjudication of Merchants' claims, which can still be defended on any grounds available to Lubow. Indeed, if the claims should ultimately be adjudicated against him by entry of a final judgment, he can raise then, in an appeal, the applicability of the legal principles which he seeks to raise now.

'While the parties, in their briefs and in argument before us, devoted much time to an extensive consideration of the facts, a brief resume will suffice for an understanding of the questions of law presented by this appeal.

Merchants is a Delaware corporation, which since 1925, has been engaged in the interim financing of real estate transactions, primarily by making construction loans and more recently by making loans secured by mortgages on unimproved real estate.

In 1960, Merchants employed Lubow as a salesman, at a salary of $100.00 per week. Later, he became a loan officer, and as Lubow's responsibilities increased, so did the importance of his position and the amount of his compensation. In 1963, he was elected a vice president of Merchants. In 1965, he became a director of the company. From 1964 to his resignation, his salary, bonuses and commissions on an annualized basis were in the $63,000 range. Lubow resigned in September, 1967, to enter business on his own account.

A matter of days after Lubow's resignation, suit was instituted in Prince George's County against Merchants, its officers and directors (including Lubow) and Sol M. Bank, an associate of Merchants, by Suitland Development Corporation, R & S Development Corporation, Warbling Meadows, Inc., and Beltway-Penn Construction Company,

Inc. through Reuben Schwartz and Beulah Schwartz, stockholders in the corporations.[2] The suit sought to enjoin the foreclosure of mortgages held by Merchants on the properties of the four corporations, and to set aside the mortgages because of fraud allegedly practiced upon the borrowers. Merchants undertook the defense of the suit in behalf of itself, its officers and directors and Lubow, and was ultimately successful. *See Suitland Development Corp. v. Merchants Mortgage Co.*, 254 Md. 43, 254 A. 2d 359 (1969).[3]

The trial of the Suitland Development case in the lower court was concluded in May of 1968, and during the summer of 1968, Merchants embarked on an investigation of the activities of Lubow and others in connection with the operations of Merchants. This investigation gave rise to the filing of the bill of complaint in Baltimore against Lubow and Sol M. Bank, a mortgage broker associated with, but not employed by, Merchants, later amended to include LeRoy E. Hoffberger and Morton J. Hollander (the partners of the law firm of Hoffberger and Hollander) as additional plaintiffs, and Eugene J. Silverman, an employee of Hoffberger and Hollander; Title Company of Maryland, and J. Elmer Weisheit, Jr., its president, and Pacy Oletsky, a former employee of Merchants, as additional defendants.

Merchants' second amended bill of complaint in 34 numbered paragraphs (24 through 57, both inclusive) sets forth separate instances where Merchants and the individual plaintiffs were alleged to have been defrauded by Lubow and the other defendants. Both the Master, in his Report and Recommendation, and the circuit court, in its decree, dealt with the claims by paragraph number, as shall we.[4]

### (i) Limitations

After a careful discussion of the defense of limitations; its

---

2. Also joined as defendants were Title Company of Maryland, Inc., and J. Elmer Weisheit, Jr., its president; Pacy Oletsky and Eugene J. Silverman, all of whom, together with Lubow and Bank, are defendants here.

3. Lubow had independent counsel on appeal.

4. These paragraphs are set out in an Appendix which follows this opinion.

availability as a defense in actions at law and its applicability to actions in equity, either by equating the defense with laches, or by applying it directly if there is a concurrent remedy at law, *Desser v. Woods,* 266 Md. 696, 704, 296 A. 2d 586, 591 (1972); *Niner v. Hanson,* 217 Md. 298, 307, 142 A. 2d 798, 802 (1958), the Master concluded that the defense was available, and that motion for summary judgment should be granted as to those claims which related to transactions which occurred more than three years before Merchants instituted suit. Accordingly, he recommended that summary judgment be entered in Lubow's favor as to the claims set forth in the following paragraphs of the amended bill of complaint: 27, 29, 30, 31, 32, 34, 35, 36, 38, 39, 41, 42, 43, 44, 45, 47, 48, and 56. The circuit court adopted the Master's recommendation and granted partial summary judgment.[5]

Both the circuit court and the Master relied heavily upon *Leonhart v. Atkinson,* 265 Md. 219, 226-27, 289 A. 2d 1, 5-6 (1972) for the proposition that a plaintiff must allege and prove four essentials in an action grounded on fraud [6] if he is to avoid his action's being barred by the statute of limitations. We do not find *Leonhart* apposite, however, as that case dealt with a situation where the plaintiff was allegedly kept in ignorance of the fact that he had a cause of action by the defendant's fraud, *see* Maryland Code (1974), Courts and Judicial Proceedings Article § 5-203, while the instant case involves plaintiffs who claim not to be chargeable with discovery of the fraud alleged to have been perpetrated by the defendants because of the existence of a confidential relationship.

Merchants challenges the invocation of limitations, arguing that the defense of limitations is not available to a

---

**5.** It would seem that paragraph 40 was substituted for paragraph 38 in a corrected order entered on 24 October 1974.

**6.** "(i) that they were kept in ignorance by the fraud of an adverse party that they had a cause of action;

"(ii) how, if fraud existed, they discovered it;

"(iii) why they did not discover it sooner; and,

"(iv) what diligence they exercised to discover it."

defendant who occupies a confidential relationship as regards a plaintiff, unless the defendant can show prejudice. We approach the problem somewhat differently.

Lubow, an officer and director of Merchants, as a matter of law, occupied a confidential relationship as regards his company, *Coffman v. Maryland Publishing Co.*, 167 Md. 275, 288-89, 173 A. 248, 253-54 (1934); *Acker, Merrall & Condit Co. v. McGaw*, 106 Md. 536, 556, 68 A. 17, 21 (1907); *Booth v. Robinson*, 55 Md. 419, 436 (1881); *Cumberland Coal & Iron Co. v. Parish*, 42 Md. 598, 604-05 (1875). *See Rolling Inn, Inc. v. Iula*, 212 Md. 596, 600, 130 A. 2d 758, 760 (1957); and *Waller v. Waller*, 187 Md. 185, 190, 49 A. 2d 449, 452 (1946). *See also* R. Clapp, *A Fiduciary's Duty of Loyalty*, 3 Md.L.Rev. 221 (1939).

Although a party is usually required to exercise ordinary diligence to discover fraudulent conduct of the opposite party, different standards are applied where fiduciaries are involved, *Desser v. Woods, supra*, 266 Md. at 708-09; *Herring v. Offutt*, 266 Md. 593, 598-601, 295 A. 2d 876, 879-81 (1972); *Perkins v. First National Bank of Atlanta*, 221 Ga. 82, 95-96, 143 S.E.2d 474, 484 (1965); *Tarpoff v. Karandjeff*, 17 Ill. 2d 462, 470-71, 162 N.E.2d 1, 5-6 (1959); *see Citizens Bank v. Leffler*, 228 Md. 262, 268-69, 179 A. 2d 686, 689-90 (1962) and 51 Am.Jur.2d *Limitation of Actions* § 452, at 914 (1970).

The Supreme Court of Georgia, in *Perkins, supra*, set forth the rule as follows:

"The rule that, in cases of fraud, the statute of limitations begins to run only from the time of the discovery of the fraud, will not apply where the party affected by the fraud might, with ordinary diligence, have discovered it. But the failure to use such diligence may be excused where there exists some relation of trust and confidence . . . between the party committing the fraud and the party who is affected by it, rendering it the duty of the former to disclose to the latter the true state of the transaction, and where it appears that it was through confidence in the acts of the party who

·committed the fraud that the other was prevented from discovering it."

We therefore conclude that the chancellor erred when he granted Lubow's motion for partial summary judgment as regards the claims set forth in the 18 numbered paragraphs of the bill of complaint on the theory that they were barred by limitations.

### (ii) Insufficiency of Evidence

Lubow moved for summary judgment in his favor as regards the claims asserted in paragraphs 24, 25, 26, 31, 32, 33, 36, 40, 41, 45, 56 and 57. The Master carefully considered each of the paragraphs, and concluded that Lubow's motion should be granted in each case, generally on the rationale that Lubow presented affirmative evidence that there had been no wrongdoing on his part, and that Merchants had no proof of the existence of the wrongdoing alleged.

The court determined, because it had provided for limited discovery in its decree, to deny the motion for summary judgment pending completion of discovery as to the claims asserted in the paragraphs enumerated above excepting paragraphs 31, 32, 36, 41, 45 and 56, where summary judgment had been granted on limitations. In view of the conclusion which we have reached as regards the availability of the defense of limitations, the motion will be denied as to those paragraphs also.

### (iii) Diversion of Business Opportunities

Lubow's motion for summary judgment as regards the claims asserted by paragraphs 38, 49, 50, 51, 53 and 54 was considered by the Master, who recommended denial of the motion because there was a genuine dispute as to a material fact: the nature of the business conducted by Traders Mortgage Company. The circuit court accepted the Master's recommendation and denied the motion. The Master had reasoned that summary judgment should be denied as to transactions involving Traders Mortgage, a partnership in

which Lubow allegedly had an interest, in order that Merchants might be afforded an opportunity to establish Lubow's liability, which is disputed. While the denial of the motion is not before us it is noted in the interest of completeness.

As regards paragraphs 39 B, 42, 44, 46, 47 and 55, the Master recommended the granting of Lubow's motion, a recommendation which the court also adopted.[7] Our decisions hold that summary judgment procedure under Rule 610 is not a substitute for trial, but rather is a determination whether there are disputed issues of fact that should be tried, *Lynx, Inc. v. Ordnance Products,* 273 Md. 1, 7, 327 A. 2d 502, 508 (1974); *Tellez v. Canton Railroad Co.,* 212 Md. 423, 430-31, 129 A. 2d 809, 813 (1957); *Frush v. Brooks,* 204 Md. 315, 321, 104 A. 2d 624, 626 (1954). The rule is that in determining whether a factual dispute exists, all inferences which may be drawn from the pleadings, from affidavits or from admissions must be resolved against the moving party, *Sherman v. American Bankers Life Assur.,* 264 Md. 239, 241-42, 285 A. 2d 652, 654 (1972); *Brown v. Suburban Cadillac, Inc.,* 260 Md. 251, 254-55, 272 A. 2d 42, 44 (1971); Rule 610.

The six paragraphs, like many other paragraphs of the complaint, allege generally that Lubow received payments, fees, commissions, gifts, or business opportunities in connection with certain transactions, which amounted to a diversion of funds or advantages which properly belonged to Merchants.

We have carefully reviewed the pleadings, affidavits, depositions, exhibits and memoranda of counsel and conclude that there is a disputed issue of material fact, to be determined by the trier of fact on the weight of the evidence: whether the alleged diversions did occur, and if they did, whether they were permitted under the terms of Lubow's employment or, if not permitted, whether there was a knowing acquiescence by Merchants. In the posture in which the case reaches us, there are evidentiary matters and

---

7. The court granted the motion as to paragraph 39 in its entirety.

material facts which are in dispute which cannot properly be disposed of by summary judgment, *Mayhew, Inc. v. Fuller Co.*, 248 Md. 1, 5, 234 A. 2d 599, 602 (1967); *McGinnis v. Chance*, 247 Md. 393, 399, 231 A. 2d 63, 67 (1967).

Remembering that this is an action in equity for discovery and accounting, and that in the language of *McGinnis v. Chance, supra*, there are equitable assessments to be made which make the application of summary judgment procedure inappropriate here, we shall reverse the decree and order of the lower court which granted Lubow's motion as regards the six paragraphs. Parenthetically, we are also of the view that the entry of summary judgment would similarly have been inappropriate as regards the paragraphs heretofore considered in the discussion of limitations.

### (iv) Discovery

Among its prayers for relief in its second amended bill of complaint, Merchants sought the entry of a decree:

"1. Granting the Plaintiff full discovery of all of the business transactions of Lubow with persons who have had dealings with the Plaintiff during the period when the Defendant Lubow served as a loan officer, or vice president or director of the Plaintiff.

"2. Directing the Defendant Lubow fully to account to the Plaintiff for all commissions, bonuses or other payments secretly and personally received by him arising out of transactions in which the Defendant Lubow was acting as an agent, or officer or director of the Plaintiff.

"3. Requiring the Defendant Lubow to make restitution to the Plaintiff for all losses resulting to the Plaintiff from breaches by the Defendant Lubow of fiduciary duties and duties of loyalty to the Plaintiff.

"4. Granting the Plaintiff full discovery of all transactions of the Defendant Lubow involving fees earned in connection with the sale or exchange of real estate and the obtaining of financing in

connection with real estate during the period of Lubow's employment by the Plaintiff.

"5. Requiring the Defendant Lubow to account for (i) all profits made by him, solely or in conjunction with others, and for all losses incurred by the Plaintiff, resulting from business opportunities within the field of business activity of the Plaintiff which were secretly diverted by the Defendant, Lubow, from the Plaintiff; and for (ii) all profits made by the Defendant Lubow as a result of his acquiring interests adverse to the Plaintiff without full and thorough disclosure of said interests by the Defendant Lubow to the Plaintiff and without the express consent of the Plaintiff thereto."

It will be recalled that Merchants, in answering the motion for summary judgment, filed a motion for the production of Lubow's financial records. The Master's Report and Recommendation contained the following paragraphs, which were adopted by the court:

"No hard and fast rule can be laid down that will apply to all of the situations alike except the general rule of fairness in discovery bearing in mind that for which the discovery rules are designed and the right of an individual to privacy. As I have proposed before, I propose now. Discovery shall in all instances be limited to a search and subsequent revelation, if indicated, of the books and records only insofar as the transactions complained of are concerned. The examination should be made by a disinterested person, who has sufficient knowledge of accounting procedures as well as the facts of this particular case to permit a discovery limited in scope without disclosing to an adversary matters of personal interest or matters not in litigation and to which he is entitled to no information.

"In addition to limiting the scope of the

disclosure to those matters to which specific and proper complaints have been made, there should also be a limitation based upon the time lapse involved. Thus, as to any one transaction, examination of the books should be limited to that period between the inception of the transaction and the end of the defendant's tax year in which the matter was closed, money was to have been paid or other milestone beyond which in the normal course of affairs no money would have passed."

The following order was entered by the court:

"ORDERED that the plaintiff's motion under Maryland Rule 419 be and the same is hereby granted as to all transactions described in the Bill of Complaint from which it is alleged that the defendant, Ralph Lubow, derived a profit, gratuity or 'Pay-off' for having recommended a loan or otherwise assisted in the placement of a loan with the plaintiff with the exception of any of those above transactions described, alleged, or set forth in those paragraphs of the Bill of Complaint which have been, may simultaneously herewith or which prior to the completion of discovery may be dismissed. Specifically the transactions to which this order is applicable includes those transactions described in the paragraphs of the Second Amended Bill of Complaint set forth below saving and excepting those transactions described in any of the paragraphs listed below if said paragraphs of the Bill of Complaint or the Bill of Complaint as to any such paragraphs may be dismissed:

| Paragraph | Transaction |
|-----------|-------------|
| 24 | Simmons |
| 25 | Simmons Associates |
| 26 | Odenton |
| 31 | Cape Canaveral |
| 32 | Mayfair |
| 33 | Mr. Real Estate |

| Paragraph | Transaction |
|-----------|-------------|
| 36 | Warbling Meadows |
| 40 | Benfield |
| 41 | Northeasterner |
| 45 | Garden Construction Company |
| 56 | Warbling Meadows |
| 57 | Warbling Meadows |

"AND IT IS FURTHER ORDERED that discovery is limited in each instance to the books and records for that period between the inception of each transaction to the end of the defendant's tax year in which the alleged transaction was closed or concluded, or the money was to have been paid;

"AND IT IS FURTHER ORDERED that the examination of the books and records of the defendant Ralph Lubow shall be conducted by Ward B. Coe, Jr., as Special Master, who shall thereafter file in these proceedings a report of his findings in which he shall disclose only those transactions shown by the books and records of the said defendant which relate directly to the allegations of those paragraphs of the Bill of Complaint which have not as of the time of said Report been dismissed."

Merchants contends that this order was so inordinately narrow that it amounted to an abuse of discretion. Merchants maintains that the order denied discovery as to four classes of claims:

Class 1. Claims held to be barred by limitations;

Class 2. Claims held to be barred either by limitations and want of evidence of liability or solely for want of evidence of liability;

Class 3. Claims on which summary judgment was denied;

Class 4. Other claims which exist, with particulars unknown.

Quoted below is the pertinent portion of Rule 419 which is here applicable:

> "Rule 419. Discovery of Documents and Property.
>
> "Any party may serve on any other party a request:
>
> "a. *Production, Inspection and Copying.*
>
> "To produce and permit the inspection and copying or photographing, by or on behalf of the moving party, of any designated documents, papers, books, accounts, letters, photographs, objects, or other tangible things, not privileged, which may constitute or contain evidence relating to any of the matters within the scope of discovery permitted by section c of Rule 400 (Application and Scope) and which are in his custody, possession or control; . . ."

The view we take of the defense of limitations and of want of evidence of liability disposes of the argument as to all of the Class 1 and Class 2 claims. Liberal discovery is particularly appropriate and should be granted as to Classes 3 and 4.

We shall therefore reverse only those portions of the decree and order of the circuit court which granted the motion for summary judgment as regards the claims asserted in paragraphs 27, 29, 30, 31, 32, 34, 35, 36, 39, 40, 41, 42, 43, 44, 45, 46, 47, 48; 55 and 56 of the bill of complaint and which limited discovery to the claims asserted in 12 numbered paragraphs of the bill. The case will be remanded for the entry of an order permitting liberal discovery as contemplated by Rule 419, including the production of Lubow's financial records. We do not propose to adopt the last two paragraphs of the court's order, heretofore quoted, which, in the circumstances of this case, we regard as excessively restrictive. Instead, if Lubow conceives the scope of the discovery to be overly broad he may seek a protective order, as provided by Rule 406.

Lubow argues that the discovery point is not before us

because the order which implemented the decree in this respect was not certified under Rule 605 a. The short answer is that it was the decree which was certified, and it was the decree which adopted the recommendation that limited discovery be granted, a recommendation implemented by an order entered the same day.

Merchants says that this litigation, because of its complexity and the number of issues involved, should be treated as a protracted case, which might appropriately be assigned to a single judge, as contemplated by Supreme Bench Rule 536. We are satisfied that this suggestion will be given consideration on remand.

> *Decree and order of Circuit Court of Baltimore City reversed in part and affirmed in part; case remanded for further proceedings conformable to the views herein expressed; costs to abide the result.*
>
> *Cross-appeal dismissed; costs in that appeal (exclusive of the cost of printing the record extract) to be paid by cross-appellant.*

## APPENDIX

Paragraphs 23 through 57 of Second Amended Bill of Complaint, filed in the Circuit Court of Baltimore City by Merchants Mortgage Company, LeRoy E. Hoffberger and Morton J. Hollander.

"23. The full scope and extent of the fraud perpetrated by the Defendants is at present unknown to Plaintiff and H & H.[1] Plaintiff and H & H therefore aver the following particulars for purposes of illustration, and not by way of limitation.

---

[1] The law firm of Hoffberger and Hollander, of which LeRoy E. Hoffberger and Morton J. Hollander were partners.

"24. Defendant Lubow processed a Loan Application, dated November 7, 1966, made, for a corporation to be formed, by one 'Rick' Simmons to Plaintiff for a loan in the amount of $265,000.00. Said loan was negotiated for the Plaintiff by Lubow and was made by Plaintiff to R. E. Simmons Co., Inc., on December 20, 1966, for a term of 18 months secured by a mortgage on 22.3 acres of land near Walker Mill Road and Addison Road in Prince George's County, Maryland. Prior to the making of said loan by the Plaintiff, and in flagrant abuse of his duty of loyalty to Plaintiff, the Defendant Lubow corruptly demanded of, and personally received from, a principal of R. E. Simmons Company, a secret payment of $6,000.00 as a condition precedent to Lubow's willingness to process, to recommend approval of, and to have Plaintiff consummate said loan.

"25. A. Defendant Lubow processed a Loan Application, dated April 11, 1966, made by Simmons Associates, Inc. to Plaintiff for a loan in the amount of $850,000.00. On May 9, 1966, as a 50% participant with another lender in a total loan of $850,000.00, the Plaintiff made a loan in the principal amount of $425,000.00 for 18 months to Simmons Associates, Inc. The loan was secured by a mortgage on 49.1866 acres of land on the southwest side of Fordson Road at U. S. Route 1, south of Alexandria, Virginia. Said property is known as the proposed Mount Vernon Shopping Center site. The loan was initially submitted to Defendant Lubow, as Vice President of the Plaintiff, directly by the principals of Simmons Associates, Inc. without the intervention or services of any broker. As a condition of recommending approval of, and having Plaintiff make said loan with its lending participant, the Defendants Lubow and Silverman,[2] aided by Weisheit,[3] Title Co.[4] and Bank,[5] corruptly received secret payments out of the loan proceeds. Said payments were concealed from Plaintiff Weisheit and Title Co. on the

[2] Eugene J. Silverman, an employee of Hoffberger and Hollander, and one of the Defendants.
[3] J. Elmer Weisheit, Jr., the president of Title Company of Maryland, Inc., another Defendant.
[4] Title Company of Maryland, Inc., one of the Defendants.
[5] Sol M. Bank, another Defendant.

settlement sheet purporting to represent the disbursement of the loan proceeds for Plaintiff by Title Co. by including said payments in a lump sum of over $600,000 purportedly disbursed to the Borrowers. A second settlement sheet was prepared by Weisheit and Title Co. for the borrowers, which was not furnished to Plaintiff by Lubow, Weisheit or Silverman, which purports to account for the disbursement to the borrowers.

"B. A portion of said payment to Lubow was fraudulently concealed on the second settlement sheet as a $25,000.00 real estate broker's commission disbursed by Title Co. for the borrower to Bank. The principals of the borrower were referred by Lubow to Bank, as a purported broker, for the purpose of arranging the secret payment. Bank neither procured the purchase by the borrower of the property securing the loan made by Plaintiff, nor produced the borrower to the Plaintiff. A portion of said 'brokerage fee', which Plaintiff believes to be $15,000.00, was secretly paid by Bank to Lubow.

"C. A portion of said secret payment to Lubow and the secret payment to Silverman were fraudulently concealed on the second settlement sheet as a $15,000.00 legal fee paid to Weisheit out of the loan proceeds. Weisheit paid $5,000.00 out of said fee to Lubow and paid $2,500.00 out of said fee to Silverman, in furtherance of the conspiracy to apply substantial portions of the cash proceeds of Plaintiff's loans among the Defendants.

"D. A portion of said secret payment in the amount of $9,000.00 was paid in cash for the benefit of Lubow out of funds recorded by Weisheit and Title Co. as net loan proceeds disbursed to the borrowers.

"26. Lubow processed a Loan Application, dated August 8, 1966, made by Odenton Enterprises, Inc. and ABB Co., Inc., for a loan in the amount of $800,000.00. On August 25, 1966, Plaintiff made said loan to Odenton Enterprises, Inc. and ABB Co., Inc., for a term of 18 months, secured by a mortgage on various parcels of land in the area of Fort Meade in Anne Arundel County, Maryland. Previously, on August 13, 1965, Plaintiff had loaned the sum of $445,000 to

Odenton Enterprises for a period of 12 months. When the loan of August 13, 1965 was becoming due, a principal of the borrowers approached Lubow, as Vice-President of the Plaintiff, for the purpose of negotiating an extension or refinancing of said loan. Lubow sought to have the borrowers engage Bank to represent them as their broker. Thereafter a refinancing of the existing $445,000 mortgage was effected by way of the $800,000 mortgage of August 25, 1966. Said new mortgage was secured by property additional to that included in the earlier mortgage and included land which had been rezoned since the earlier mortgage. The refinancing was effected between the Plaintiff, acting principally through Lubow, and the borrowers, acting principally through their corporate President and not through Bank. Although the borrowers never agreed to pay any commission to Bank, the borrowers, at the loan settlement, in order to obtain disbursement of said loan, endorsed a check, payable to the borrowers, to Bank in the amount of $45,000, out of the net loan proceeds, for the recited purpose of payment of a brokerage commission. Said recital was a fraudulent disguise for the payment of a secret and corrupt commission to Lubow pursuant to the conspiracy between Bank and Lubow to obtain a secret commission for Lubow in fraud of the rights of the Plaintiff. Title Co. and Weisheit concealed said disbursement to Bank from Plaintiff on the settlement sheet purporting to represent the disbursement of the loan proceeds for Plaintiff by Title Co. by including said payments in a lump sum purportedly disbursed to borrower. In addition, and in order to obtain settlement of said loan, the borrowers endorsed in blank a second check payable to them in the amount of $35,000.00 out of the net loan proceeds and delivered the same to Title Co. The additional payment was also a secret and corrupt commission to Lubow, paid in order to obtain settlement of the loan to the borrowers.

"27. Lubow processed a Loan Application, dated January 16, 1965, made by Route One Properties, Inc., to Plaintiff for a loan of $595,000.00. On February 2, 1965, Plaintiff made said loan secured by a mortgage on land lying between the

northbound and southbound lanes of U. S. Route 1 in Laurel, Prince George's County, Maryland. Said loan was a refinancing of a prior loan by Plaintiff in the principal amount of $150,000. In consideration of Lubow's recommending that the Plaintiff make said loan of February 2, 1965, Lubow, on February 3, 1965, received and accepted a secret and corrupt commission in the amount of $17,500.00 from the borrower acting through a corporation related to the borrower. Said loan is now in default and the Plaintiff has suffered a loss of interest and will suffer a loss of a substantial portion of the principal amount thereof, for which Lubow is liable to the Plaintiff.

"28. A. Defendant Lubow processed a Loan Application, dated February 21, 1966, made by M & K Inc., to Plaintiff for a loan of $85,000.00. On March 16, 1966, the Plaintiff made said loan for a term of 18 months secured by a mortgage on Lots 2, 3, 4 and 5 of Block One, North Laurel, Prince George's County, Maryland. In consideration of Lubow's recommending that the Plaintiff make said loan, Lubow, on March 22, 1966, received and accepted a secret and corrupt commission of $2,000.00 from the principal of the corporate borrower. Said loan is now in default and the Plaintiff has suffered a loss of interest and will suffer a loss of a substantial portion of the principal amount thereof, for which Lubow is liable to the Plaintiff.

"29. Lubow processed a Loan Application, dated June 22, 1964, made by Parkway Industrial Park, Inc., to Plaintiff for a loan of $310,000.00. On August 28, 1964, the Plaintiff loaned to Parkway Industrial Park, Inc. the sum of $225,000.00 for 18 months secured by a mortgage on 13.42 acres of land lying on Maryland Route 17, near the Baltimore & Washington Parkway. In consideration of Lubow's recommending that the Plaintiff make said loan, Lubow, on September 1, 1964, received and accepted a secret and corrupt commission of $10,000.00 from the principal of the corporate borrower. Said loan is now in default and the Plaintiff has suffered and will suffer a loss of interest and a loss of a substantial portion of the principal amount thereof, for which Lubow is liable to the Plaintiff.

"30. On February 21, 1963, the Plaintiff made a mortgage loan to Laurel Planning and Redevelopment Corporation in the amount of $520,000.00 for a term of two years, secured by a mortgage on property located on Whiskey Bottom Road in the Sixth Election District of Howard County, Maryland. Said property consisted of a tract in excess of 100 acres. On October 22, 1963, Laurel Planning and Redevelopment Corporation entered into a contract for the sale of the property to certain individuals who later assigned the same to Whiskey Bottom Properties, Inc. Said contract provided for a purchase price of $1,000,000 of which $250,000 was to be paid in cash at settlement, the purchasers (or assigns) were to assume the $520,000 first mortgage to the Plaintiff and the purchasers were to give to the seller a second Deed of Trust for $230,000. Said contract provided for settlement within one year from date. A condition of said contract was that the mortgage to Plaintiff, which was then due February 20, 1965, be extended to provide that the principal and interest not be due thereon until 18 months after the closing date contemplated by the contract of sale. The sale by Laurel Planning and Redevelopment Corporation to Whiskey Bottom Properties, Inc., after one or more extensions, closed on November 12, 1965. The mortgage to Plaintiff, on the recommendation of Lubow, had been extended to April 21, 1966. Lubow materially aided the Plaintiff's borrower in negotiating and effecting the contract of sale of October 22, 1963 for which Lubow was paid, unknown to the Plaintiff, a total of $50,000 by two equal payments made in the period between contract and closing, that is, on November 7, 1963 and January 20, 1964. As part of his employment by the Plaintiff, Lubow owed a duty to Plaintiff to assist borrowers in the sale of the property securing their loans from Plaintiff (in order to aid said borrowers to pay off said loans) and to avoid any personal interest in such transactions. In violation of his duty of loyalty and duty to disclose and pay over the $50,000 payment to Plaintiff, the Defendant Lubow did not reveal said payment to Plaintiff, but instead secretly and personally retained said payment from himself, while recommending Plaintiff's cooperation in the transaction.

"31. A. Lubow processed a Loan Application, dated March 3, 1965, made, for a corporation to be formed, by one Jacob Martin to Plaintiff for a loan of $540,000.00. On March 8, 1965, the Plaintiff loaned to the Canaveral Hotel Corporation, a Florida corporation, the sum of $375,000.00, advanced that day against a total land loan commitment of $540,000.00. The balance of said loan, in the amount of $165,000.00, was to be advanced at the time the borrower settled for a construction loan which it was seeking. Said mortgage was secured by 8.77 acres of land on Florida State Route No. 401 in Brevard County, Florida. In consideration of Lubow recommending that the Plaintiff make said loan, the borrower paid for the benefit of the Defendant Lubow, a secret and corrupt commission of $2,500.00.

"B. In addition, Lubow secretly agreed with a principal of Canaveral Hotel Corporation that Lubow would procure, or assist in procuring, a construction mortgage for the erection of a proposed hotel on the property securing the mortgage from the Plaintiff to Canaveral Hotel Corporation, and that Lubow would assist said principal in inflating the projected construction costs of said hotel, for which Lubow would secretly and personally share with the principal of Canaveral Corporation in the excess construction mortgage funds over and above the amounts required to construct the hotel and to pay off the mortgage to the Plaintiff. Lubow further secretly agreed with the principal of Canaveral Hotel Corporation that Lubow would assist in obtaining a permanent mortgage on the subject property, improved by a hotel, in an amount greatly in excess of the amount required to take out the construction mortgage, for which Lubow would secretly and personally share with the principal of Canaveral Hotel Corporation, and others, in the excess permanent mortgage funds. Said loan is now in default. The Plaintiff has suffered and will suffer a substantial loss on the aforesaid transaction for which Lubow is liable to the Plaintiff.

"32. The Plaintiff arranged for a loan which was made on December 12, 1962, in the amount of $420,000.00 by National

Brewing Company [6] of Michigan, Inc. to Mayfair Terrace Apartments, Inc. secured by 19.6 acres of land zoned for apartment use in Southeast Washington, D. C. Said loan had in turn been brought to Plaintiff by a mortgage loan broker to whom the Plaintiff agreed to pay a forwarding fee of $10,000.00 for presenting the loan. In addition, the said forwarding broker, by agreement with the borrower, was to receive a fee of $17,500.00 for procuring the loan. $8,000.00 of the fee from the borrower was to be paid to the forwarding broker at settlement and payment of the balance of $9,500.00 was to be deferred. Lubow abused his position of trust and confidence with the Plaintiff by threatening that the loan would not close if he were not paid a secret commission and thereby coerced or induced the forwarding broker to pay to the Defendant Lubow the sum of $8,000.00 in order to have the loan close. Lubow corruptly and personally received said payment of $8,000.00 from the forwarding broker following the closing of the loan and concealed said payment from the Plaintiff.

"33. [A.] Lubow processed a Loan Application, dated July 20, 1966, made by Mr. Real Estate, Inc., a Virginia corporation, to Plaintiff for a loan of $147,000.00. On August 19, 1966, the Plaintiff loaned the sum of $145,000.00 to Mr. Real Estate, Inc., as a result of the fraud hereinafter described. Said loan was secured by a first deed of trust on 14 acres of land on Griffin Drive in Fairfax County, Virginia and by a second deed of trust on 6 contiguous acres. Said loan application was brought to the Plaintiff by the Defendant, Bank. Bank conspired with Lubow, in connection with said loan, to defraud the Plaintiff and to effect the payment of secret commissions to Lubow in order to obtain said loan from the Plaintiff. In pursuance of said conspiracy and in order to support his recommendation that Plaintiff make the proposed loan to Mr. Real Estate, Inc., the Defendant Lubow prepared, or caused to be prepared and submitted to Plaintiff, a contract of sale bearing date of July 15, 1966 from A. Claiborne Leigh Development Company, a

---

[6] A company in which members of the Hoffberger family hold substantial interests.

Virginia corporation, as seller, to Mr. Real Estate, Inc., as buyer, under which the 14 acres of land which would be the first lien security of the Plaintiff were purportedly to be purchased by the borrower at and for a price of $215,000.00, cash at settlement. Said contract was false and fraudulent in the following particulars, all of which were known to the Defendants Lubow and Bank. Said contract did not evidence an arm's length transaction, or, any transaction, between the purported seller and the purported buyer. The principal of A. Claiborne Leigh Development Company, the purported seller, was then and there a joint venturer with the principal of Mr. Real Estate, Inc. Each of said venturers had a 50% participation in the sums to be realized by the resale and/or development of the property. Further, A. Claiborne Leigh Development Company did not in fact or law legally or equitably own the subject property. There was, in fact, no agreement to buy and sell between the joint venturers and the said contract was not an indicium of value. Said property was, in fact, under contract to Mr. Real Estate, Inc. as buyer, under three separate contracts of purchase from other parties, at a true purchase price for twenty acres of $177,500.00 of which $77,500.00 was to be paid by purchase money mortgages back to two of the actual sellers.

"B. Bank received payments from the borrower and from Plaintiff which totaled $16,050.00 in connection with the closing of the loan from the Plaintiff to Mr. Real Estate, Inc. A substantial portion of said $16,050.00, was corruptly received by Lubow, pursuant to said conspiracy, as a secret commission in consideration of the making of said loan by his principal, the Plaintiff.

"C. The loan from the Plaintiff to Mr. Real Estate is in default, and the mortgage securing the same has been foreclosed at a deficiency in excess of $60,000.00. The Plaintiff was materially induced to make the aforesaid loan by the false and fraudulent contract of sale presented to it by Lubow. Further, had Plaintiff known of the secret commission to be paid to its trusted employee, Lubow, Plaintiff would not have made said loan.

"34. A. Lubow processed a Loan Application, dated

August 12, 1965, made by Suitland Development Corp. to Plaintiff for a loan of $250,000.00. On August 26, 1965, the Plaintiff made said loan to Suitland Development Corporation secured by a mortgage on approximately 2.7 acres of unimproved, commercially zoned land at the intersection of Suitland Road, Ewing Avenue and Arnold Road in the Bowie section of Prince George's County, Maryland. The application to Plaintiff for said loan was made for Suitland Development Company by one Reuben Schwartz, President of said corporate borrower. A brokerage fee of $10,000.00 was paid by the Plaintiff to Bank for producing said borrower. Said brokerage fee was paid as a result of fraud on the part of Bank and Lubow, who conspired to conceal and concealed from the President of the Plaintiff and from its directors the fact that the Defendant Bank was a 50% owner of the borrower, Suitland Development Corp. Had said facts been disclosed by Lubow to the Plaintiff's President and directors, the aforesaid fee of $10,000.00 to the Defendant Bank would not have been paid. The Defendants Lubow and Bank are liable to the Plaintiff in the amount of said fee.

"B. Further Lubow obtained from the borrower, out of the net proceeds of the loan, the sum of $22,500.00 as a secret commission for his recommending that the Plaintiff make said loan.

"C. On said transaction Weisheit and Title Co. paid to Lubow and Silverman out of charges to the borrower for title insurance and examination, in excess of customary title insurance commissions, a secret commission of $485 each, and an additional secret commission to Lubow of $300.

"35. In August of 1965, the Plaintiff was the owner of 2.7582 acres of land, more or less, located at the intersection of the Baltimore-Washington Parkway and the Bowie-Laurel Road in Prince George's County, Maryland. Title to said property, hereinafter called 'Oak Hill Farm' was acquired by the Plaintiff by foreclosure of a mortgage from Oak Hill Farms, Inc. On August 12, 1965, the Plaintiff entered into a contract for the sale of Oak Hill Farm to R & S Development Corporation, a Maryland corporation for

$150,000.00, of which $115,000.00 was deferred and secured by a purchase money mortgage from the buyer to the Plaintiff. The said contract recited the agreement of Plaintiff and of R & S Development Corporation that one Bernard D. Lipsitz had brought about the sale and Plaintiff agreed to pay to said Bernard Lipsitz a commission of 10%, i.e., $15,000.00. The promise of Plaintiff was obtained by fraud on the part of Lubow who, in breach of the trust and confidence reposed in him by the Plaintiff, falsely represented to the Plaintiff's officers and directors that the facts concerning the origination of the contract to purchase the Oak Hill Farms property were as set forth in said contract and falsely represented that one Reuben Schwartz was the principal of R & S Development Corp. Contrary to said representations, and pursuant to a conspiracy to defraud the Plaintiff entered into by Lubow, Bank and one Shepard Powell,[7] the facts of the transaction are as follows: R & S Development Corp. (R & S) had been formed by Lipsitz, an attorney, acting at the direction of his neighbor, Bank, for the purpose of taking title to Oak Hill Farm. The directors of R & S were Bank, and his wife and Reuben Schwartz, and his wife. Bank was Vice-President of R & S. One half of the stock initially issued by R & S on September 10, 1965 was issued to Reuben Schwartz and one half was issued to Leona Bank, wife of the Defendant, Sol Bank. The Oak Hill Farm property had been shown to R & S and R & S had been produced as a purchaser of said property by the Plaintiff, acting through one Shepard Powell, who was then an employee in the office of the Plaintiff and carried on the payroll of the Plaintiff. Bank directed Lipsitz to prepare the contract of August 12, 1965 for submission by R & S to Plaintiff, which falsely recited that Lipsitz had produced the buyer. On September 29, 1965, the sale to R & S by the Plaintiff, and the purchase money mortgage of $115,000 were closed. At that time the Plaintiff, acting in reliance on the fraud of the Defendants, paid to Bernard Lipsitz the purported commission of $15,000.00. Lipsitz

---

[7] At one time an employee, later a business associate of Charles C Hoffberger, President of Merchants.

retained $1,000.00 of said 'commission' and pursuant to instructions from Bank, paid the balance of $14,000 to Shepard Powell. Powell retained $4,000.00 out of said $14,000.00 in order to have the funds to pay income taxes on $14,000.00 and paid the balance of $10,000.00 to Lubow, as a secret and corrupt commission for having effected the loan to Bank's company, R & S, all pursuant to the conspiracy between Lubow, Bank and Powell to defraud the Plaintiff. Said loan is now in default and the Plaintiff has suffered a loss of interest and will suffer a loss of a substantial portion of the principal amount thereof, for which Lubow and Bank are jointly liable.

"36. A. Lubow processed a Loan Application dated October 8, 1965 made by Warbling Meadows, Inc. to Plaintiff for a loan of $300,000.00 later reduced to $250,000.00. On November 8, 1965, the Plaintiff made said loan to Warbling Meadows, Inc. secured by a mortgage on approximately 86 acres lying on Warfield Road in the Laytonsville District of Montgomery County, Maryland. The application to Plaintiff for said loan was signed in the name of Warbling Meadows, Inc. by one Reuben Schwartz, as President of said corporate borrower. A brokerage fee, of $12,500.00 was paid by the Plaintiff to the Defendant Bank for producing said borrower. Said brokerage fee was paid as a result of fraud on the part of Bank and Lubow, who conspired to conceal and concealed from the president of the Plaintiff and from its directors the fact that Bank was a 50% owner of the borrower, Warbling Meadows, Inc. Had said facts been disclosed by Lubow to the Plaintiff's President and directors, the aforesaid fee of $12,500.00 to Bank would not have been paid. Bank and Lubow, are liable to the Plaintiff in the amount of said fee.

"B. Lubow obtained from Schwartz the sum of $35,000.00 as a secret commission for his recommending that the Plaintiff make said loan to Warbling Meadows. Further in pursuance of the conspiracy between Lubow and Bank, under which Lubow agreed to recommend that Plaintiff make the loan to Warbling Meadows, Inc. in consideration

of a secret commission paid by Bank to Lubow, Bank paid Lubow the sum of $9,500.00.

"C. Said loan is now in default and the Plaintiff has suffered and will suffer the loss of a substantial portion of the amount thereof, and interest thereon, for which Lubow and Bank are liable to the Plaintiff.

"37. A. Lubow processed a Loan Application, dated January 20, 1966, made by Beltway-Penn Construction Company, Inc. to Plaintiff for a loan of $1,400,000.00. On February 9, 1966, the Plaintiff made a loan in the principal sum of $700,000.00 to Beltway-Penn Construction Company, Inc. secured by a mortgage on approximately 44 acres of unimproved land at the intersection of the Washington Beltway and Westphalia Road in Prince George's County, Maryland. At the same time Plaintiff's 50% participant, Mercantile-Safe Deposit and Trust Company, loaned Beltway-Penn Construction Company, Inc. $700,000.00 secured by the same property. A brokerage fee of $42,000.00 was paid by the Plaintiff to Bank for producing said borrower. Said brokerage fee was paid as a result of fraud on the part of Bank, Lubow, Title Co., Weisheit and Silverman, who conspired and concealed from the President of Plaintiff and from its directors the fact that Bank was an owner of portions of the tract making up the security and was a principal stockholder of the borrower, Beltway-Penn Construction Company, Inc. Had said facts been disclosed to the Plaintiff's President and directors, the aforesaid fee of $42,000.00 to Bank would not have been paid. The aforesaid Defendants are jointly liable to the Plaintiff in the amount of said fee.

"B. Further pursuant to the conspiracy between Lubow, Weisheit, Title Co., Bank and Silverman to defraud Plaintiff, Lubow caused Plaintiff to engage Weisheit as its agent for the purpose of obtaining a 50% participant in the making of the loan to Beltway-Penn, for a fee of 10% of the loan participation amount, or $70,000. Weisheit, materially assisted by Lubow, obtained Mercantile-Safe Deposit and Trust Company as said participant. At the closing of said

loan, Weisheit was paid the gross sum of $70,000, out of which the loan origination fee to the participating lender of $21,000 was paid. Out of the net fee, Weisheit paid $3,000 to Silverman at settlement as a secret commission. In addition, Title Co. paid to Silverman as a secret commission one-third of the excess title insurance and examination charges made by Title Co. to the borrower. One-third of the excess title insurance and examination charges were similarly paid by Title Co. to Lubow. Further, Weisheit in substance created a pool comprising the net brokerage fee paid by Plaintiff, to Weisheit, less the secret commission to Silverman, and a $10,000 legal fee paid to Weisheit by Sol Bank out of the brokerage commission paid to Sol Bank by the Plaintiff. Said pool was in substance divided evenly between Weisheit and Lubow resulting in a secret commission to Lubow of $27,750.

"C. In addition to acting as settlement officer, Weisheit was an agent of the Plaintiff in the transaction and owed the Plaintiff the duty to disclose the foregoing arrangements and not to pay secret commissions to other agents of the Plaintiff. Weisheit is liable to the Plaintiff not only jointly with Lubow and Silverman for the secret commissions paid to them, but also for the $27,750 ultimate net amount retained by Weisheit out of the fee paid by Plaintiff to Weisheit as Plaintiff's agent.

"D. The said loan has defaulted and the mortgage has been foreclosed at a deficiency as to the Plaintiff's one-half interest of $204,400.92 for which Lubow, Weisheit, Title Co., Bank and Silverman are liable to the Plaintiff.

"38. A. On June 17, 1964, the Plaintiff made a partial purchase money mortgage in the amount of $35,000 to Aras Investment Corporation for a term of one year, on the security of certain residential, unimproved lots in a subdivision known as 'South River Manor' in the Second Election District of Anne Arundel County, Maryland. Said loan was extended for an additional year to June 16, 1966. Said mortgage to the Plaintiff was paid in full on or about June 21, 1966 as a result of a refinancing recommended by Lubow under which the Plaintiff assigned its mortgage to

one Jack A. Gordon, an individual who was at the time known by the plaintiff to be engaged in a loan business but who was at the time believed to be unconnected with any of the employees of the Plaintiff. Lubow and Silverman concealed and failed to disclose to the Plaintiff that said refinancing was in fact effected by Traders Mortgage Company, a partnership engaged in making mortgage loans and in which Lubow, unknown to Plaintiff, had an interest. Lubow and Silverman further concealed that the said mortgage was immediately reassigned by Jack A. Gordon to Traders Mortgage Company. The amount of the fees and profits made on said transaction by Lubow are at present unknown to the Plaintiff. Silverman, in June 1967, participated as attorney for the lender in a further extension of said loan and assignment thereof to Eastpoint Motors Inc. and Gordon-Lubow, a partnership. Pursuant to the conspiracy between the defendants, Silverman continued to conceal Lubow's conflict of interests from the Plaintiff.

"39. On December 16, 1964, the Plaintiff had made a loan in the amount of $630,000 to Washington-Rockville Industrial Park, Inc. in conjunction with a co-lender, Atlas Credit Corporation, which loaned an equal amount to the same borrower. The total loan of $1,260,000 was secured by a mortgage on property of Washington-Rockville Industrial Park located in Montgomery County, Maryland. Out of the loan proceeds Lubow was paid a secret and corrupt commission in the amount of $30,000. Weisheit and Title Co., for the purpose of concealing said secret commission from the Plaintiff, prepared a false closing statement for the transaction. Said statement falsely represented that as of December 18, 1964 the sum of only $15,000 had been disbursed to one Milton Kaplan for broker's commission, that the legal fees of Weisheit were $900 and that after total disbursements the 'balance due borrower' was $96,485.44. Said settlement sheet did not reflect the actual disbursements made on December 18, 1964 by Weisheit and Title Co. of an additional $40,000 in purported broker's commissions to Milton Kaplan, for a total of $55,000 recorded by Title Co. as so disbursed; that an additional

$1,600, or a total of $2,500, was disbursed to Weisheit and that the net disbursement actually made that date to the borrower was only $54,855.44. The secret commission of $30,000 to Lubow was paid out of the sum of $55,000 recorded by Title Co. purportedly as a broker's commission disbursed to Milton Kaplan.

"B. Under the terms of the aforesaid loan, the Borrower was entitled to obtain partial releases from the mortgage as lots were sold in the industrial park, upon payment by the borrower of a stipulated release fee. On the 15th day of February, 1967, Washington-Rockville Industrial Park, Inc. sold 2.03 acres of land in Block 'G' of the industrial park to Gerald J. Schipper and Marvin M. Gibson, as tenants in common, for $168,999 of which $50,000 was paid in cash at settlement and the balance of $118,000 was deferred, evidenced by a promissory note from the purchasers to the seller and secured by a purchase money Deed of Trust. Upon payment to the Plaintiff of $138,500 of principal and interest on the loan, the Plaintiff and Atlas Credit Corporation, by partial release recorded March 31, 1967, released the parcel sold to Schipper and Gibson from the operation of the mortgage of December 16, 1964. At the times above alleged, there remained a balance unpaid on the mortgage of December 16, 1964 and other lands of Washington-Rockville Industrial Park, which were unsold by it, remained subject to the operation of the mortgage. At said times and thereafter it was and remained the duty of Lubow to deal with Washington-Rockville Industrial Park on behalf of the Plaintiff in connection with collection of the mortgage and releases of additional lands sold by the borrower. Unknown to the Plaintiff, and without disclosure of his interest therein, Lubow and Jack Gordon took an assignment of the note in the amount of $118,000, at a substantial discount from the principal face amount thereof, although said note bears interest at the rate of 6% per annum and the makers thereof are financially responsible. Said property was sold in January, 1968 at a price of $250,000, resulting in a substantial profit to Lubow on the note secured by a lien on said property.

"40. On the 20th day of January, 1965, Lubow processed a loan application by Benfield Corporation for a loan in the amount of $100,000 for the purpose of acquiring approximately 8.45 acres of land in Cecil County, Maryland. In order to support a loan in that amount, Lubow submitted to the Plaintiff a purported contract from Elkton Investment Corp. as seller to Benfield Corporation as buyer, reciting a purchase price of $120,000. Lubow knew said purported contract was a forgery. The actual purchase price for the property offered as security was $55,684. Contracts to purchase the property offered as security were in fact held by one Lawrence Goodman. On February 16, 1965, the loan from the Plaintiff was made to Benfield Corporation in the amount of $100,000. Benfield Corporation purchased the property securing the loan, as assignee of Lawrence Goodman, for a true purchase price of $55,684. Out of the loan funds in excess of the purchase price Lubow was paid a secret commission of $22,000. Further without the knowledge or consent of the Plaintiff, Silverman acted as attorney for Goodman in the transaction and concealed from the Plaintiff his conflicting representation, concealed from the Plaintiff the true settlement sheet reflecting the actual disbursements made, concealed the true purchase price of the property securing the loan and concealed the fact that the contract of purported purchase by Benfield Corporation was not the true contract under which title was taken by Benfield Corporation, and that title was in fact taken by assignment of other contracts from his client, the said Lawrence Goodman. Silverman was paid a counsel fee of $1,000 by Goodman for the transaction.

"41. On November 8, 1963, the Plaintiff made a loan in the amount of $80,000 to Northeasterner, Inc., a corporation of which the principal was Dr. John H. Solomon. Said loan was secured by approximately 7.5 acres of land located on Cole Street and on Aiken Avenue in Perryville, Cecil County, Maryland. In consideration of Lubow's recommending said loan to the Plaintiff, Lubow was paid a secret commission of $8,000 by the borrower.

"42. On July 20, 1965, Lubow, at the request of the

President of the Plaintiff, became licensed as a real estate broker by the Real Estate Commission of Maryland. Said license was obtained in order that the Plaintiff would be entitled to real estate broker's commissions on sales transactions effected by Plaintiff's employees. Licensed as a real estate salesman, under said license, was Oletsky.[8] On January 14, 1966, Cabin John Mall Associates, a limited partnership, sold an apartment development known as the Lakeside Terrace Apartments located in Bethesda, Montgomery County, Maryland. The general partner of Cabin John Mall Associates was Dr. John H. Solomon. Contrary to his duty of loyalty to the Plaintiff herein, and unknown to the Plaintiff a commission of $22,500 was paid on said sale to Ralph Lubow Real Estate Company, of which $16,000 was secretly retained by Lubow and $5,250 was secretly retained by Oletsky.

"43. On May 12, 1964, the Plaintiff made a mortgage loan to Northeasterner, Inc., a corporation of which Dr. John H. Solomon was the principal, in the amount of $200,000, secured by approximately 20 acres of land lying at the intersection of Maryland Route 222 and John F. Kennedy Memorial Highway in Cecil County, Maryland. Weisheit and Title Co. prepared a settlement sheet purportedly evidencing the disbursements of the loan proceeds made at the settlement, which settlement sheet contained an entry that the sum of $3,875 had been disbursed for 'legal services'. Said sum did not represent legal services exclusively, in that there was paid by Weisheit to Lubow out of said sum a secret commission of $300 for the referral of said transaction of the Plaintiff to Weisheit. Further concealed by said settlement sheet was the payment out of said sum of $3,875, of the sum of $2,500 disbursed by Title Co. to Silverman for 'legal services.' Said sum represents a secret commission to Silverman in consideration of his participation in the concealment of secret commissions paid on the subject and other loans made by the Plaintiff to Dr. John H. Solomon's corporations or partnerships. In the alternative, if said

---

[8] Pacy Oletsky, one of the Defendants.

payment of $2,500 represents a legal fee paid by Dr. John H. Solomon for services actually rendered by Silverman to Dr. Solomon, said services were rendered without the knowledge and consent of the Plaintiff, and constitute a breach of duty by Silverman to his client, the Plaintiff. Further, in the alternative, if the sum of $2,500 represents the charge for legal services actually rendered by Silverman as attorney for the Plaintiff, which charge is payable by the borrower pursuant to the loan application, Silverman failed to remit said fee to H & H as required by the terms of his employment as an associate attorney of H & H.

"44. On November 4, 1964, the Plaintiff made a mortgage loan in the amount of $420,000 to Bureau Properties, Inc., a corporation of which the principal was Dr. John H. Solomon. In connection with said loan Lubow received a secret commission of $4,500. Said commission was paid to Lubow by Weisheit out of a purported legal fee of $9,000 paid by Dr. Solomon to Weisheit. Weisheit and Title Co. concealed said disbursement to Lubow and did not reflect the same or the $9,000 'legal fee' from which it was paid on the settlement sheet furnished the Plaintiff purporting to represent the disbursement by Title Co. of the loan proceeds and other funds involved in the settlement.

"45. On December 17, 1963, the Plaintiff made a mortgage loan in the amount of $135,000 to Garden Construction Co. (of Miami), Inc., a corporation of which the principal was Dr. John H. Solomon. Said loan was secured by approximately 23 acres of land located near Gaithersburg, Montgomery County, Maryland. In consideration of Lubow recommending said loan, Lubow received a secret commission in the amount of $15,000. paid by the borrower.

"46. On February 10, 1966 Potomac Development Corporation, a corporation of which Dr. John H. Solomon was the principal, sold four elevator type high rise apartment buildings known as Parcel A, Lakeview, in Montgomery County, Maryland to Banzig Corporation, a District of Columbia corporation at and for a purchase price of $1,948,455.47. Lubow participated in effecting the

contract of sale for said property from Dr. Solomon to Ruth Rossen, who assigned the same to Banzig Corporation. At said closing (not conducted by Title Co.) Lubow was paid a broker's commission of $14,000. Contrary to his duty of loyalty to the Plaintiff, Lubow secretly negotiated said contract and secretly retained said commission which was payable to the Plaintiff under the terms of Lubow's employment by the Plaintiff.

"47. [A.] The aforesaid Dr. John H. Solomon was one of the most active accounts of the Plaintiff during Lubow's employment. The Plaintiff made the following loans to corporations or partnerships of which Dr. Solomon was a principal:

$100,000 to Mid Century Homes on May 4, 1962;

$80,000 to Northeasterner, Inc. on November 18, 1963;

$135,000 to Garden Construction Company of Miami on December 17, 1963;

$200,000 to Northeasterner, Inc. on May 11, 1964;

$420,000 to Bureau Properties, Inc. on November 4, 1964; and

$650,000 loan, sold immediately without recourse, made to Venture 70 S on January 11, 1966.

Lubow worked most closely with Dr. Solomon and arranged, negotiated and recommended the aforesaid loans.

"B. On November 4, 1964, Dr. Solomon, acting through his corporation, Bureau Properties, Inc., acquired in excess of 170 acres of unimproved land lying on the southwest and the northeast sides of U. S. Route 70 S near its intersection with Muddy Branch Road. in Montgomery County, Maryland. Said property was acquired at a price of $7,200 per acre. On January 4, 1965, Bureau Properties, Inc. conveyed the aforesaid 170 acres, *inter alia,* to a Maryland limited partnership, Venture 70 S. Dr. Solomon was the general partner of Venture 70 S and had a 60% interest therein. Without disclosing the same by any public record, Lubow acquired a 20% interest in the said limited

partnership, the same being one-third of the interest of Dr. Solomon as general partner. On August 15, 1966, the 60% interest in Venture 70 S, held in the name of Dr. Solomon, but of which Lubow owned a one-third interest, was sold at a price of $1,842,551.52 paid in part in cash, in part by the purchaser taking subject to existing mortgages on the property and in part by the creation of a purchase money Second Deed of Trust. Out of said sale Lubow received, or had applied for his account, the sum of $61,346.96 in cash and $300,498.44 by way of a note assigned to Lubow and secured by the aforesaid purchase money Second Deed of Trust.

"C. The aforesaid cash disbursements at closing on the sale of the Venture 70 S property were received by, or applied to the account of, Lubow in violation of his duty of loyalty to the Plaintiff, and the aforesaid note was received by Lubow in violation of his duty to the Plaintiff and is held by him as a constructive trustee for the Plaintiff, in that the 20% interest in Venture 70 S assigned by Dr. Solomon to Lubow was in consideration of Lubow's having obtained the aforesaid loans for Dr. Solomon over a period of time from the Plaintiff.

"D. Lubow sought a consent by the Plaintiff to a personal investment by him in Venture 70 S. Any such purported consent is void because of fraud. Sometime following the acquisition by Bureau Properties, Inc. of the land referred to in this paragraph 47, Lubow advised the president of the Plaintiff, that he, Lubow, had the opportunity to invest $50,000 in the property as a participant with Dr. Solomon. The Plaintiff consented to such a cash investment by Lubow. However, Lubow concealed from the Plaintiff that he was not making any cash investment in the property and that his contribution toward the expenses of carrying the property until sale, after rezoning, would not be currently paid by him, but would be paid (and was in fact paid) out of the cash proceeds received on the ultimate sale of the Venture 70 S property. Further, to the extent that any cash capital contribution to the partnership was made by Lubow, it was done on the basis of a loan to Lubow by Dr. Solomon and not

by way of cash invested by Lubow. The amount of any such loan constituted so fractional an amount in relation to the value of Lubow's partnership interest, as measured by the original cost of the property, that the same constituted a gift to Lubow of the value of Lubow's interest, in excess of the value paid by Lubow, and was in consideration of Lubow's obtaining loans from the Plaintiff for Dr. Solomon.

"48. Defendant Lubow processed a Loan Application, dated March 30, 1965, by Share A Like Corporation to Plaintiff for a loan of $640,000. On June 4, 1965, the Plaintiff made a mortgage in the amount of $640,000 to Ebb Tide, Inc. and Share-A-Like, Inc. secured by 63 acres of land in the Third Election District of Anne Arundel County, Maryland, known as the 'Stoney Creek property' and secured by 462 acres in the Seventh Election District of Anne Arundel County, Maryland, known as the 'Share-A-Like Farm.' Shortly thereafter, one Sidney Stein, the independent auditor for the Plaintiff, approached Lubow and sought advice concerning investment opportunities which would yield a good return. Although Lubow knew that the principals of Ebb Tide, Inc. and Share-A-Like, Inc. were seeking a loan for these corporations for which they were willing to pay both a substantial loan origination fee and also a broker's commission, Lubow referred the said Sidney Stein to Defendant Bank who, on July 7, 1965, effected a second mortgage loan by Sidney Stein to Ebb Tide, Inc. and Share-A-Like, Inc. in the principal amount of $50,000. For said services, Sol Bank was paid a brokerage fee of $10,000 by the borrowers. The aforesaid fee of $10,000 represents a business opportunity of the Plaintiff which was diverted from the Plaintiff by Lubow in violation of his duty of loyalty to the Plaintiff. Title Co. and Weisheit participated in said fraud on the Plaintiff by concealing from Sidney Stein, the lender, the fact that a $10,000 brokerage fee was being paid by the borrower. The concealment was effected by the calculated manipulation of copies of the settlement sheet so that the lender's copy would not reflect the $10,000 fee intended to be shown on the borrower's copy of said sheet.

"49. The Defendant Lubow processed a loan application dated June 8, 1966 by Shirtan Investment Corporation to the Plaintiff for a loan in the amount of $135,000 to be secured by 2.81 acres of land located on Piscataway Road in Prince George's County, Maryland. At the same time as the aforesaid Piscataway Road property was offered as security for a loan from the Plaintiff, a second parcel of land was presented to the Plaintiff, acting through Lubow, as security for a possible loan. Said second parcel consisted of 30,000 square feet at the intersection of U. S. Route 301 and Billingsly Road in Charles County, Maryland. In violation of his duty of loyalty to the Plaintiff, Lubow diverted the loan opportunity presented by the Billingsly Road parcel to Traders Mortgage Company, a partnership, in which, unknown to Plaintiff, an interest was held by Lubow. On July 15, 1966, Shirtan Investment Company made a mortgage to Traders Mortgage Company in the amount of $33,000 secured by the aforesaid Billingsly Road parcel. Lubow failed to disclose to the President of the Plaintiff, or to the other directors of the Plaintiff, his personal pecuniary and conflicting interest in the transaction and is liable to the Plaintiff for the profit or gain diverted from the Plaintiff and realized by him out of said loan by Traders Mortgage Company to Shirtan Investment Corporation. Silverman acted as attorney for Traders Mortgage Company in said transaction and, pursuant to the conspiracy among the Defendants, concealed from the Plaintiff the conflicting interest of Lubow.

"50. On January 26, 1967, Traders Mortgage Company, a partnership, in which Lubow was a partner, made a loan in the amount of $32,500 to Shirtan Investment Corp., secured by a First Purchase Money Mortgage on approximately one acre of land lying on the Suitland to Forestville Road in the Sixth Election District of Prince George's County, Maryland and further secured by cross collateral provisions by the Charles County property referred to in Paragraph 49 hereof. Said loan opportunity was presented to Lubow who, in violation of his duty to the Plaintiff, secretly diverted said opportunity to Traders Mortgage Company. Lubow is

liable to the Plaintiff for all profits realized on said loan. In addition, at the closing of said loan, Lubow was paid a commission of $500 in addition to his interest in the partnership known as Traders Mortgage Company. Further, Silverman acted as attorney in said transaction and received a fee in the amount of $200. Silverman failed to disclose said transaction to his client, the Plaintiff, or said fee to H & H, all in furtherance of the conspiracy among the Defendants.

"51. On March 21, 1966, the Plaintiff made a first mortgage loan to Danor Charles Corporation, secured by certain contiguous lots, and improvements thereon, in the 2600 block North Charles Street, Baltimore, Maryland. At or about the same time, the principal of Danor Charles Corp., P. Daniel Orlich, made, in substance, a second mortgage to Traders Mortgage Company on a shopping center in Vienna, Virginia, which property was also owned by him. Silverman was paid a fee by Orlich in the amount of $475 for services rendered as attorney for Traders Mortgage Company. Silverman failed to advise his client, the Plaintiff, that Lubow was engaged in the mortgage loan business in Traders Mortgage Company and failed to remit said fee to H & H, in order further to conceal the conspiracy among the Defendants.

"52. On July 15, 1966, the Plaintiff made a mortgage loan to Ed Jacobson, Jr., Inc. in the amount of $145,000 secured by certain lots in Burning Tree Estates development in Montgomery County, Maryland. At the closing of said loan, Weisheit charged the borrower a legal fee of $225 which Weisheit evenly divided between himself, Silverman and Lubow, as a secret commission for the referral of the transaction.

"53. On August 17, 1966, Traders Mortgage Company made a second mortgage loan to The Earl Lipchin Co., secured by two parcels of property in Anne Arundel County and by a property in Baltimore City. Silverman represented Traders Mortgage Company in the transaction for which he was paid a fee of $150 at closing. Silverman failed to advise his client, the Plaintiff, that Lubow was engaged in the mortgage loan business in Traders Mortgage Company and

failed to remit said fee to H & H, in order further to conceal the conspiracy among the Defendants.

"54. On September 7, 1966, Traders Mortgage Company made a second mortgage loan in the amount of $65,000 to Medichin, Inc., secured by two properties located in Baltimore City. Silverman represented Traders Mortgage Company in the transaction for which he was paid a fee of $150 at closing. Silverman failed to advise his client, the Plaintiff, that Lubow was engaged in the mortgage loan business in Traders Mortgage Company and failed to remit said fee to H & H, in order further to conceal the conspiracy among the Defendants.

"55. Unknown to the Plaintiff's President and Directors (other than Lubow), Lubow has for several years conducted a real estate business from his home. Licensed as real estate salesmen for the real estate company of the Defendant Lubow were two employees of the Plaintiff, Pacy Oletsky and Shepard Powell, as well as Bank and Jack Gordon, a broker who has had transactions with borrowers from the Plaintiff. Further without the knowledge of the Plaintiff's President, or of its Directors (other than Lubow), Lubow has been engaged at times material to this action as a principal in the business of 101 Holding Co., Selective Investment Company, Traders Mortgage Company and Gordon-Lubow, part of the business of each of which is to arrange or make real estate mortgage loans. The Plaintiff believes and avers that there are instances other than herein alleged of diversion by the Defendant Lubow, acting solely or in conjunction with others, of business opportunities from the Plaintiff; the full particulars of which are at present unknown to the Plaintiff.

"56. A. On October 8, 1965, the Defendant Bank submitted a loan application to the Plaintiff in the name of Warbling Meadows, Inc. In connection with said loan, Defendant Bank fraudulently concealed from the Plaintiff's officers and directors (other than Lubow), the fact that Bank was a 50% owner of Warbling Meadows, Inc. with one Reuben Schwartz, and that Bank was a principal in the transaction. Bank falsely represented that Warbling

Meadows, Inc. was solely owned by Reuben Schwartz and that he, Bank was merely a mortgage loan broker in the transaction, as a result of which Bank was paid a broker's commission by the Plaintiff. Bank further falsely represented in the said application that the loan proceeds, after payment of loan costs and release of an existing mortgage, would be applied 'to . . . develop [the] land.' Said representation by Defendant Bank was false and fraudulent in that the Defendant Bank and Reuben Schwartz, as the principals of Warbling Meadows, Inc., had no intention, then or thereafter to develop the mortgaged property securing the loan by use of the loan proceeds for such purpose. Said misrepresentation fraudulently concealed the true intention of Bank and Schwartz from the officers and directors of the Plaintiff (other than Lubow), which was to use the net proceeds of the loan to establish and operate the business of First Mortgage Corporation, a corporation equally owned by Bank and Schwartz. Under said plan First Mortgage Corporation would engage in the business of placing mortgage loans through the Plaintiff, by paying secret commissions to Lubow for recommending the loans to the Plaintiff, and would represent itself as being the authorized agent and representative of the Plaintiff for mortgage loans in the District of Columbia metropolitan area. First Mortgage Corporation was neither then, nor at any time thereafter, authorized by Plaintiff to act as, or to represent itself as being the agent and representative of the Plaintiff.

"B. On November 8, 1965, the loan by the Plaintiff to Warbling Meadows, Inc., in the principal sum of $250,000 was closed and net loan proceeds in the amount of $192,609.69 were disbursed to Warbling Meadows, Inc. Said net proceeds were never used for the development of the mortgaged property as represented. On the contrary, and in accordance with the misrepresented and fraudulently concealed intent of Bank and Schwartz, said proceeds were taken by Defendant Bank and Schwartz out of the assets of Warbling Meadows, Inc., and applied to the credit of First Mortgage Company. In substance, Bank and Schwartz each contributed one-half of the net loan proceeds as his

respective capital contribution to First Mortgage Corporation. After certain payments out of said funds, including amounts representing secret commissions to Lubow for recommending to Plaintiff the loan to Warbling Meadows, Inc., Defendant Bank and Schwartz used the remaining funds to operate a mortgage loan brokerage business in the vehicle of First Mortgage Corporation.

"C. The Plaintiff relied on the false representations of Defendant Bank as aforesaid, and, had the true facts not been concealed and misrepresented by the fraud of the Defendant Bank, Plaintiff would not have made the loan to Warbling Meadows, Inc.

"D. Said loan is now in default. No part of the principal has been paid and no interest has been paid for the period following December 1, 1966. Plaintiff has and will suffer a substantial loss as a result of the fraud of Defendant Bank.

"57. At the closing of the aforesaid loan, the net sum of $192,609.69 received in cash by Warbling Meadows, Inc. became an asset of Warbling Meadows, Inc.

"Shortly after the aforesaid closing, the Defendant Bank and Schwartz each caused one-half of the said assets of Warbling Meadows, Inc., to be transferred to themselves, by Warbling Meadows, Inc., without any consideration to the said Warbling Meadows, Inc., for their own personal use and benefit. Said use and benefit included their funding, each as 50% owners, of the business of First Mortgage Corporation. The effect of the aforesaid transfer was to render Warbling Meadows, Inc. insolvent and to defraud its creditors. Said transfer was made at a time when Warbling Meadows, Inc., and Defendant Bank and Reuben Schwartz intended and believed that Warbling Meadows would incur debts beyond its ability to pay the same as they matured. Said transfer was made with the intent to hinder, delay and defraud the principal creditor of Warbling Meadows, Inc., the Plaintiff. The particulars of said fraud are set forth in Paragraph 56 of this Second Amended Complaint."